_____

|                              |   |
|------------------------------|---|
|                              | ) |
|                              | ) |
| **MARK DUTKEWYCH,**          | ) |
|                              | ) |
| **Plaintiff,**               | ) |
|                              | ) |
| **v.**                       | ) |  **Civil Action No. 12-cv-11073**
|                              | ) |
| **STANDARD INSURANCE CO.,**  | ) |
|                              | ) |
| **Defendant.**               | ) |
|                              | ) |

_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                        **March 29, 2014**

## I.     Introduction

Plaintiff Mark Dutkewych ("Dutkewych") and Defendant Standard Insurance Company ("Standard") have cross-moved for summary judgment on Dutkewych's claims for unlawful denial of benefits pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), and attorney's fees and costs. D. 43; D. 44. For the reasons discussed below, the Court ALLOWS the Defendant's motion for summary judgment, D. 43, and DENIES the Plaintiff's motion for summary judgment, D. 44.

## II.     Procedural History

Dutkewych filed his complaint on June 17, 2012, bringing ERISA claims against Standard and Mintz Levin Cohn Ferris Glovsky & Popeo's ("Mintz") PC Group Long Term Disability Plan ("the Plan"). D. 1. The Court allowed the parties' joint motion to dismiss Mintz

1

from the action on September 5, 2012. D. 11. Dutkewych filed an amended complaint on September 27, 2012. D. 12. Both Standard and Dutkewych moved for summary judgment. D. 43; D. 44. After a hearing, the Court took both motions under advisement. D. 69.

## III.    Standard of Review

Generally, the Court will grant summary judgment when there is no genuine dispute of material fact and the undisputed facts show that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In ERISA benefit denial cases, however, summary judgment "simply a vehicle for deciding the issue." Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005). The Court "does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Leahy v. Raytheon Co., 315 F.3d 11, 17–18 (1st Cir. 2002) (applying this standard when the parties moved for cross-summary judgment).

In an action brought pursuant to 29 U.S.C. § 1132(a)(1)(B), if the benefit plan at issue grants the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the Court applies an "arbitrary and capricious" standard of review, Leahy, 315 F.3d at 15 (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)) (quotation omitted), mandating "deference to the findings of the plan administrator."[1] Id. at 18. "For purposes of reviewing benefit determinations by an ERISA plan administrator, the arbitrary and capricious standard is functionally equivalent to the abuse of discretion standard." Wright v. R.R. Donnelley & Sons Co. Grp. Benefits Plan, 402 F.3d 67, 74 n.3 (1st Cir. 2005).

---

[1] The LTD plan provided that Standard had "full and exclusive authority to . . . interpret the Group Policy and resolve all questions arising in the administration, interpretation and application . . ." R. 829-830. The parties do not dispute that the deferential, as opposed to *de novo*, standard of review applies in this case. D. 54-1 at 1; D. 56 at 17-18.

To determine whether the administrator's decision was arbitrary and capricious, "the ordinary question is whether the administrator's action on the record before him was unreasonable." Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 24 (1st Cir. 2003) (citing Cook v. Liberty Life Assurance Co. of Boston, 320 F.3d 11, 19 (1st Cir. 2003); Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d 415, 419 (1st Cir. 2000)). "Evidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision." Wright, 402 F.3d at 74. The Court "asks only whether a factfinder's decision is plausible in light of the record as a whole . . . ." Leahy, 315 F.3d at 17 (citations and quotations omitted); Colby v. Union Security Insurance Company, 705 F.3d 58, 61 (1st Cir. 2013). Still, while "the rationality standard tends to resolve doubts in favor of the administrator," Liston, 330 F.3d at 24, the First Circuit has emphasized that "there is a sharp distinction between deferential review and no review at all." Colby, 705 F.3d at 61.

## IV.   Facts

### A.   LTD Plan Coverage

Dutkewych was employed by Mintz as an associate attorney from 2005 to early 2009. D. 48 ¶ 1; D. 57 ¶ 1. Mintz sponsored and maintained an employee benefit welfare plan ("the Plan") which offered long-term disability ("LTD") benefits, D. 48 ¶ 2; D. 57 ¶ 2. Standard served as the Plan's claims administrator. D. 48 ¶ 3; D. 57 ¶ 3.

The Plan defines "disability" as the inability to perform the material duties of one's "Own Occupation" and a twenty percent loss in income. R. 812.[2] The Plan limits benefits to twenty-four months for certain disabilities "caused or contributed to by any one of the following: 1. Mental Disorders; 2. Substance Abuse; or 3. Other Limited Conditions." R. 826. "Mental

---

[2] "R." refers to the Administrative Record filed at D. 29.

Disorder" is defined in the Plan as "mental, emotional, behavioral, psychological, personality, cognitive, mood or stress-related abnormality, disorder, disturbance, dysfunction or syndrome, regardless of cause . . . or the presence of physical symptoms." R. 826. "Mental Disorders" includes "bipolar affective disorder, organic brain syndrome, schizophrenia, psychotic illness, manic depressive illness, depression and depressive disorders, anxiety and anxiety disorders." R. 826. "Substance Abuse" is defined as the "use of alcohol, alcoholism, use of any drugs, including hallucinogens, or drug addiction." R. 826. "Other Limited Conditions" include "chronic pain conditions (such as fibromyalgia . . .)." R. 826.

Under the Plan's twenty-four month limited benefit period ("the Two Year Limitation"), "[n]o LTD benefits will be payable after the end of the limited pay period, unless on that date you continue to be Disabled as a result of a Physical Disease, Injury, or Pregnancy for which payment of LTD Benefits is not limited." R. 826. The Plan defines "Physical Disease" as "a physical disease entity or process that produces structural or functional changes in the body as diagnosed by a Physician." R. 832.

### B. Dutkewych's Benefits Claim Determination

Dutkewych's last day of active work at Mintz was October 3, 2008. R. 4972. Standard approved Dutkewych's LTD claim on April 16, 2009, citing the reason for his disability as "a combination of chemical dependency and psychiatric disorders of life threatening proportions." R. 3998. Because his disability fell under the categories of Mental Disorder and Substance Abuse, Standard noted in the claim approval letter that Dutkewych's benefits would be limited to twenty-four months. R. 3998.

On April 26, 2011, Standard notified Dutkewych that his LTD benefits would be ending, as the Two Year Limitation had expired and Dutkewych's "claim file [did] not support that [he

was] Disabled by a Physical Disease or Injury." R. 2943. On October 20, 2011, Dutkewych requested that Standard review its decision to apply the Two Year Limitation, supplementing his appeal with evidence that he had been, and continued to be, physically disabled by Lyme disease. R. 2612. Standard notified Dutkewych's counsel by letter on May 4, 2012 (the "May 4 letter") that a review of the medical records did not substantiate that Mr. Dutkewych was precluded from performing his occupation R. 640; see 612-40. "Rather, they support that your client's mental health conditions in combination with his chronic pain condition (fibromyalgia) and substance abuse are the most likely cause of your client's reported symptoms." R. 615.

Dutkewych asserts that prior to this benefits denial, both the Social Security Administration ("SSA") and Standard had acknowledged that based on his medical records, Lyme disease caused his disability. D. 46 ¶¶ 105-11, 117-20. Around April 28, 2009, Standard approved Dutkewych for premium waiver on his life insurance policy based on a disability. R. 3066. On June 10, 2010, the SSA approved Dutkewych for total disability benefits, finding that he was impaired by "Lyme disease, fibromylagia, muscle/joint pain, depression and substance abuse." R. 4175. Standard also noted in its electronic records on December 21, 2011 that it was reasonable that Dutkewych continued to be totally disabled based on the medical information received from Dr. Ruiz, a neurologist, regarding a Lyme disease diagnosis. R. 5160. The notes, as they appear in the administrative record, appear to be related to the monitoring of Dutkewych's premium waiver benefit by Standard's life insurance administrator. See id.

### 1.    *Standard's Review of Dutkewych's Medical Records – Lyme Disease*

Dutkewych visited his primary care physician, Dr. Serrano, three separate times in July 2008 with complaints of back pain, difficulty sleeping, fatigue, bruising on his left arm, thigh and torso, extended periods of diarrhea, a rash on his buttocks, bleeding of his gums and

spontaneous nosebleeds. R. 4591-95. He also reported feeling clumsy and disoriented. R. 4591. Dutkewych was prescribed pain medication and referred to a hematologist regarding the bruising and bleeding. Id.

On August 1, 2008, Dutkewych reported the same symptoms to Dr. Haynes, a hematologist, adding that he was experiencing night sweats, swollen hands and pain. R. 4524-26. Dr. Haynes discussed the possibility of Lyme disease with Dutkewych, who told the doctor that he did not recall receiving any recent tick bites or "recent viral exposure or tick exposure." R. 4524. Dutkewych's blood tests revealed negative results for Lyme disease antibodies, although the laboratory noted that negative test results did not rule out the possibility of borrelia burgdorferi infection (Lyme disease) because the patient could be in the early stages of producing detectable antibodies. R. 4530.

Dutkewych returned to Dr. Serrano's office for two additional visits in August 2008, complaining of the same symptoms. R. 4588-89. Dutkewych asked to be retested for Lyme disease; the blood work test results returned negative. R. 4588. Dutkewych was prescribed pain medication and referred to a rheumatologist and infectious disease specialist. Id.

Rheumatologist Dr. Goldenberg examined Dutkewych on September 4, 2008. R. 4610. Dr. Goldenberg's follow up letter stated that Dutkewych's chief complaints were pain throughout his joints, "pins and needles" sensations in his extremities, muscle weakness, frequently dropping items and cognitive disturbances that affected concentration. R. 4610. Dutkewych summarized his physical symptoms as feeling like "my body is falling apart." Id. Dr. Goldenberg recognized in his letter that Dutkewych had been seeing a psychiatrist for approximately six months. Id. Dr. Goldenberg concluded that there were no obvious physical signs of joint swelling, pain or weakness, but that Dutkewych's symptoms were consistent with

fibromyalgia and recommended that further evaluation or laboratory testing should not be done. R. 4611.

On November 4, 2008, Dutkewych visited a family practitioner, Dr. Hubbuch, who wanted to rule out Lyme disease, although he was aware Dutkewych had three negative Lyme disease tests previously. R. 622; 839-42. Dr. Hubbuch ordered a Western blot test and a Babeisa FISH test, neither of which had yet been performed on Dutkewych, from IGeneX laboratory in California. R. 841-42, 4570. The tests were conducted that month and the Western blot test returned positive results for Lyme disease under the IGeneX IGG criteria but negative results under "CDC/NYS" and "Babesia FISH" criteria tests. R. 4570-72. When Dutkewych returned for a follow-up visit with Dr. Serrano, the doctor noted as Dutkewych's problems obsessive compulsive disorder ("OCD"), anxiety, primary fibromyalgia syndrome and diarrhea. D. 4585.

On June 16, 2009, Dutkewych began seeing Dr. Isselbacher, who agreed to continue treating Dutkewych for Lyme disease. R. 3169. Dr. Isselbacher indicated that Dutkewych continued to see Dr. Isselbacher for the next year, as well as a neurologist, Dr. Ruiz. R. 3169-70. Standard observed during its medical review that Western blot testing ordered by Dr. Ruiz and performed on September 22, 2009, R. 2543, and December 10, 2010, R. 2454-56, both returned similar results to the 2008 tests – the IGeneX criteria indicated positive for Lyme disease, while the CDC/NYS criteria test indicated negative results. R. 628. A Lyme disease serology reflex test from June 2009 also returned negative results. R. 3674.

Beginning in March 2010, Dutkewych began seeing psychologist Dr. Statlender, PhD., because of her "professional experience with patients diagnosed with central nervous system Lyme disease." R. 2679. Dr. Statlender stated she specialized in helping these patients cope with the "neuropsychiatric sequela" of Lyme disease. Id. Dr. Statlender noted that "an initial

worsening of symptoms may occur during the initial stages of antibiotic treatment for Lyme disease, similar to the Jarisch-Herxheimer reaction in the treatment of syphilis." R. 2684. Dr. Statlender recorded an observation that, given the lack of legal trouble or substance abuse before 2008, "in retrospect, one wonders if the acute deterioration in Mr. Dutkewych's condition, culminating in his arrest . . . could have been indicative of Jarisch-Herxheimer-like reaction, triggered by the initial course of antibiotic therapy for his Lyme disease, and later by the initiation of a second antibiotic regime." R. 2684. Dr. Statlender also stated that Dutkewych had not abused substances since she began seeing him in March 2010 and that Dutkewych had been late diagnosed with Lyme Disease. R. 2685.

In a letter dated August 2011, Dr. Ruiz stated that Dutkewych had tested positive for and suffered from Lyme disease for many years and that he had been treating Dutkewych for Lyme disease since September 2009. R. 5172. He also wrote that "[i]n March 2008, Mr. Dutkewych developed symptoms consistent with multisymptom organ disease condition . . . and finally diagnosed with late Lyme disease during the fall of 2008." R. 5166. Dr. Ruiz suggests that Dutkewych had previously been misdiagnosed as not having Lyme disease. R. 5166-68. He also concluded that the disease "disables him from performing the duties of [his] occupation as an attorney." Id. "Further, it limits his ability to work in any occupation on a full-time basis." Id.

In May and June of 2011, Dutkewych underwent neuropsychological testing by Dr. Shea, PhD., R. 2325, which revealed cognitive deficiencies compared to Dutkewych's "innate abilities," given his academic accolades and education. R. 2332. Dr. Shea concluded that Dutkewych's "cognitive capacities represented on this evaluation indicates a significant decline in function which cannot be explained by depression alone, and negated his ability to carry out the duties of his position as an Associate" at Mintz. R. 2340. Dr. Shea recorded that in his

medical opinion, based on his training, education and experience, Dutkewych's "cognitive difficulties is primarily based in the resultant neurologic sequela of Lyme disease with central nervous involvement." Id.

2.      Standard's Review of Dutkewych's Medical Records – Mental Disorders and Substance Abuse

Dutkewych was seen at the Psychiatric Emergency Department of Cambridge Health Alliance on September 11, 2008, where he reported depression, suicidal thoughts and somatic symptoms. R. 4759. He stated "I don't know what to do . . . I need help." Id. Dutkewych cited that his increasing physical symptoms and his medical providers' hesitancy to further explore his medical condition were worsening his depression. Id. The medical notes stated that Dutkewych felt hopeless and desperate, particularly over his inability to work and uncertainty as to whether he could ever return to his high stress, demanding job. R. 4761. He reported feeling guilty, unable to get out of bed and contemplating suicide; the notes, however, also indicated he was "future-oriented, displaying help-seeking behavior." R. 4760. Dutkewych was diagnosed with major depressive disorder and obsessive compulsive disorder and was discharged to a two-week Cambridge Partial Hospital Program. R. 4765, 4770.

In December 2008, Dutkewych was admitted to McLean Hospital for substance abuse. R. 4885. Dutkewych admitted that he was addicted to pain killers. R. 4881. Dutkewych was transferred to the Drug and Alcohol Abuse Treatment Program at McLean, R. 4890, and continued to participate in an outpatient program. R. 4300-22.

Dutkewych began seeing Dr. Zusky, a psychiatrist, in February 2009. R. 3420. Dutkewych reported struggling with depression and anxiety since college, but noted his most severe episode was in 2008. Id. Dutkewych stated he had been attending the OCD clinic at Massachusetts General Hospital since 2004 and that medication helped his symptoms and

functionality.  Id.  Dr. Zusky noted that Dutkewych had experienced improved mood and reduced OCD symptoms while taking the Lyme disease medications, although they had been stopped due to a diagnosis of fibromyalgia.  Id.  Dr. Zusky also observed that Dutkewych had become addicted to his Lyme disease medications, which were mainly pain killers.  R. 3424.  Dr. Zusky's clinically diagnosed Dutkewych as suffering from major depressive disorder, OCD, anxiety disorder and a history of substance abuse.  Id.  Dr. Zusky continued to treat Dutkewych through March 2009, noting a relapse and increased depression.  R. 3417-18.  Dutkewych was readmitted to McLean Hospital in June 2009 for substance abuse and stayed at two residential treatment facilities between June 2009 and December 2009.  R. 3931-32.

###### 3.  Standard's Independent Review

Standard selected three independent physician consultants to review Dutkewych's disability claim.  During the LTD claim's initial review in April 2011, Jennifer Baker was the lead claims analyst and Dr. Sigal, an internist and rheumatologist, provided the outside review of Dutkewych's medical records.  R. 630-31, 2760.  Dr. Sigal asserted that over the course of twenty years, he has conducted "extensive research on Lyme disease," writing over 250 chapters and papers on the disease and receiving awards for this research.  R. 2760.  Dr. Sigal also indicated that he made a "major contribution to a large clinical study of a preventative vaccine, extensive laboratory research on the immunopathogenesis of Lyme disease," as well as multiple testing studies, participation in clinical trial for antibiotic treatments of Lyme disease and "clinical descriptive studies of the clinical features of Lyme disease."  R. 2760.  Dr. Sigal indicated that prior to working for the pharmaceutical industry, he was chief of the rheumatology division of Robert Wood Johnson Medical School.  Id.  He further indicated that as of 2011, he continued to see patients at the medical school's rheumatology clinic.

Upon review of Dutkewych's medical records, Dr. Sigal found that they did not "logically support a medical diagnosis of Lyme disease based on objective and scientific evidence." R. 2763. Dr. Sigal stated there was "ample evidence" to support Dutkewych's medical diagnoses of fibromyalgia, his history of drug use and psychiatric disorder, but that his health care providers were distracted by a "false diagnosis of 'chronic Lyme disease.'" Id. Dr. Sigal cited the negative Lyme disease tests and stated that the IGeneX routinely reported false negatives. R. 2761-62. Dr. Sigal explained that IGeneX has its own Lyme disease criteria, which varies from the criteria set forth by the Centers for Disease Control and Prevention ("CDC"). Id. Dr. Sigal wrote that "[there] is no clinical proof that there is a clinical entity known as 'chronic Lyme disease.'" Id.

After Dutkewych filed a claims appeal, Dutkewych's treating physicians, Drs. Raxlen, Shea and Ruiz, submitted additional medical reports on Dutkewych's behalf. R. 1386, 2287, 5166. Dr. Raxlen submitted a letter to Standard on December 13, 2011 disputing Dr. Sigal's conclusion, alleging that Standard hired Dr. Sigal to conduct the review because Dr. Sigal does not believe chronic Lyme disease exists. R. 1391. Dr. Raxlen questioned Dr. Sigal's motivation and credibility, given that Dr. Sigal never examined Dutkewych and is not a trained psychiatrist, even though he was hired to review files of a patient determined to have mental impairments. R. 1391, 1394-95.

As part of the appeals process, Standard hired two independent medical doctors to review Dutkewych's medical records to evaluate whether Lyme disease was the cause of his disabling condition. R. 631, 638. First, Standard consulted Dr. Raymond J. Dattwyler, an immunologist and past member of the CDC Lyme Disease Treatment Guideline Committee and the Infectious Disease Society of America. R. 518-522, 631. Dr. Dattwyler concluded that Dutkewych never

had Lyme disease because his testing never produced positive results for Lyme disease based on the CDC's serology criteria. R. 497. Dr. Dattwyler explained that the IGeneX test used to diagnosis Dutkewych in 2008 did not meet the CDC testing criteria and produced a high rate of false positive results. R. 493-95, 497. Additionally, Dutkewych never had the bull's eye-shaped rash on his skin that develops at the site of the tick bite in more than ninety percent of Lyme disease patients. R. 489. Dr. Dattwyler opined that "any question of disability secondary to Lyme disease is moot. You cannot be disabled by something you do not have." R. 503. Further, Dr. Dattwyler supported Dr. Sigal's belief that chronic Lyme disease is a questionable condition, calling it an "ill-defined entity whose very existence is doubtful." R. 501. Dr. Dattwyler wrote that Lyme disease "is now being applied to patients with vague complaints both with and without a history of Lyme disease" and that chronic Lyme disease is "not accepted as a diagnosis by mainstream medicine." R. 497. Dr. Dattwyler stated:

> The whole issue of 'chronic Lyme disease' is being pushed by a group of physicians who profit from having a group of patients who in all honesty are poorly served by mainstream medicine, combined with patients and their families who needed a reason for their vague but troublesome symptoms.

R. 501.

Standard then consulted Dr. Robert Gant, a neuropsychologist, and requested that he specifically review Dr. Shea's report on the cause of Dutkewych's cognitive impairments. R. 638. Dr. Gant concluded that he was unable to establish the presence of inability to work in any capacity because the "insufficient, inconsistent and unreliable information is available to establish a conclusive diagnosis." R. 480, 482. Opining that Dr. Shea relied too heavily on chronic Lyme disease as the diagnosis, Dr. Gant believed that Dr. Shea did not consider alternative explanations for Dutkewych's test results. R. 482. Dr. Gant agreed with Dr. Dattwyler that Lyme disease "is not accepted as a diagnosis in mainstream medicine." Id.

Dr. Dattwyler and Dr. Gant's medical opinions both were outlined in the May 4 letter to Dutkewych. R. 631–39. Standard concluded that "the assessments of Drs. Dattwyler and Gant [are] well reasoned and consistent with the medical evidence in Mr. Dutkewych's claim file when considered as a whole." R. 640. Standard upheld its decision to terminate benefits because Dutkewych was not disabled by Lyme disease, or any other physical disease, at the time when the Two Year Limitation expired in April 2011. Id.

## V.    Discussion

Dutkewych argues that Standard abused its discretion in several ways: (1) Standard erroneously relied on biased medical consultants who do not believe that chronic Lyme disease exists, D. 45 at 14; (2) Standard ignored the body of medical records showing that several of Dutkewych's treating physicians diagnosed him with and treated him for Lyme disease, id. at 19; (3) the record establishes that Dutkewych was disabled by chronic Lyme disease, id. at 21; (4) Standard ignored the possibility of a contributing physical disability, id. at 29; and (5) Standard's medical review process to determine Dutkewych's total disability for life insurance waiver of premium is internally inconsistent with its LTD benefit denial, id. at 34. The Court addresses these arguments.

### A.    Standard Did Not Abuse Its Discretion By Relying on Reviewing Consultants to Conclude that Dutkewych Was Not Disabled by Lyme Disease

#### 1.    Reliance on Standard's Medical Consultants

The crux of Dutkewych's claim is that Standard abused its discretion by hiring reviewing consultants who do not believe that chronic Lyme disease exists and deferring to the opinions of those reviewing consultants, as opposed to the treating physicians who reached contrary opinions.

The Court first addresses the sufficiency of the reviewing consultant's Lyme disease expertise. ERISA regulations require that disability plan administrators consult independent medical consultants with "appropriate training and experience in the field of medicine involved in the medical judgment" during the initial and appeal claim review processes. 29 C.F.R. § 2560.503-1(h)(3)(iii) - (h)(4) (requiring plan to consult an appropriate health care professional in reviewing a claim on appeal); id. § 2560.503-1(h)(3)(iv) - (h)(4) (requiring that the plan's medical expert did not provide consulting in the initial benefits determination). "The term 'health care professional' means a physician or other health care professional licensed, accredited, or certified to perform specified health services consistent with State law." 29 C.F.R. § 2560.503-1(m)(7). The regulations do not impose additional requirements, definitions or prohibitions on how the plan administrator must select its independent consultants.

The May 4 letter expressly specifies the medical qualifications of the independent consultants selected, which further persuades the Court that these consultants were qualified to provide a medical review. R. 631-32. Dr. Dattwyler, who provided the majority of the clinical data and review upon which Standard relied in the May 4 letter, was the board-certified Chief of Allergy, Immunology and Rheumatology at New York Medical College. R. 631.

Dr. Dattwyler also has specific experience with diagnosing Lyme disease – he was a member of both the CDC Lyme Disease Case Definition Committee and the Infectious Disease Society of America's Lyme Disease Treatment Guideline Committee, as well as the former co-chair of the National Institute for Health's CDC Conference on the Laboratory Diagnosis of Lyme and Tick-Borne Infections. Id. Similarly, Dr. Sigal was equally qualified to provide an expert medical opinion, as he, in addition to the qualifications noted above, was also board-certified and has served as the National Scientific Advisor for the American Lyme Disease

Foundation. R. 631; see also Schwob v. Standard Ins. Co., 248 F. App'x 22, 28-29 (10th Cir. 2007) (recognizing Dr. Sigal as a Lyme disease expert and determining his opinion supported plan decision to terminate benefits). Finally, Dr. Gant is a board-certified neuropsychologist who was retained specifically to evaluate Dutkewych's cognitive testing and functioning, which is within his specialty. R. 636-37.

Dutkewych further argues that Standard's choice to hire Dr. Sigal and Dr. Dattwyler is "particularly egregious because both have been financially rewarded for denying the existence of chronic Lyme disease," citing the amounts of money Standard paid to them for their reports in this case. D. 45 at 15. But which way any bias may cut here, between well qualified experts to conduct a review of this particular diagnosis, even one they disfavored, and the claimant's treating physicians who are invested in that diagnosis, does not undercut the reasonableness of Standard's decision. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 832 (2003) (declining to adopt the "treating physician rule" from the SSA context in review of determinations under ERISA plans and noting, among other things, that "if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled'"). Despite the Plaintiff's contentions that Standard's chosen experts were motivated by financial reward, the Court concludes, as discussed above, that Standard was reasonable in relying on these consultants to make its benefits determination. Second, as discussed in full below, given, as Dutkewych admits, the uncertain state of this area of medicine, D. 46 ¶¶ 28-30, the Court cannot conclude that Standard abused its discretion in crediting the opinions of experts who have questioned the existence of chronic Lyme disease. For instance, in arguing that Dr. Dattwyler and Dr. Sigal have "made a living espousing [the] belief that chronic Lyme disease does not exist," D. 45 at 15, the writing to

which Dutkewych cites to support this argument as to Dr. Dattwyler merely references Dr. Dattwyler's opinion concerning the preferred course of treatment for late-treated Lyme disease patients. R. 987. Further, the same article describes the disagreement within the medical field as to Lyme disease as "one of the most vicious medical wars we've ever seen." Id. Similarly, while the article cites Dr. Sigal's work consulting for health insurance companies, R. 989, as discussed above, the Court cannot say that this alone undercuts the reasonableness of Standard's decision. Accordingly, Standard satisfied its ERISA obligation to obtain independent medical review. See 29 C.F.R. § 2560.503-1(h)(3)(v) - (h)(4).

### 2. *Categorical Exclusion of Chronic Lyme Disease*

Dutkewych next argues that by "relying upon the opinions of doctors who deny the existence of chronic Lyme disease, Standard has, in effect, created a categorical exclusion that cannot be found in the terms of the policy." D. 45 at 16. In support of this argument, Dutkewych cites the First Circuit's decision in Colby v. Union Sec. Ins. Co., 705 F.3d 58 (1st Cir. 2013). There, the court held that "in refusing to consider whether the plaintiff's risk of [drug] relapse swelled to the level of a disability," the defendant abused its discretion because it "could have written into the plan an exclusion for risk of relapse, but it did not choose to do so." Id. at 67. Colby is distinguishable from this case, however, on two important grounds. First, the Colby court specifically noted that "this appeal poses only a single question: whether, under the plan, [the administrator] exercised its discretion reasonably in terminating the plaintiff's benefits on the ground that risk of relapse cannot constitute a present disability." Id. at 61. The court elaborated: "Our holding today is narrow. It pivots on a fusion of the plain language of the plan and [the defendant's] all-or-nothing approach to its benefits determination." Id. at 67. Second, while "the overwhelming weight of [] evidence" indicated that the plaintiff was at risk of relapse,

the Colby court did not have to reach the issue of the sufficiency of the evidence because the defendant "took a categorical approach, steadfastly maintaining that risk of relapse, whatever the degree, could not constitute a current disability under the plan." Id. at 64-65. Here, Standard concludes that "the available evidence does not support that Mr. Dutkewych has been precluded from performing his Own Occupation as a result [of] Lyme disease." R. 640. In so concluding, Standard noted that the assessments of Dr. Dattwyler and Dr. Gant were "consistent with the medical evidence in Mr. Dutkewych's claim file when considered as a whole" and that they were "consistent with the prior medical review conducted [by] Dr. Sigal and with the opinion expressed by Dr. Goldenberg in September 2008." R. 640. As the Court discusses below, while there is evidence in the record supporting a diagnosis of Lyme disease or chronic Lyme disease, there is still substantial evidence in the record supporting otherwise, upon which Standard relied in making its determination that Dutkewych was not disabled by Lyme disease. That is, unlike Colby in which the plan administrator relied upon a "single-minded insistence" that "a risk of relapse, no matter how grave, could not constitute a current disability," Colby, 705 F.3d at 64-65, Standard did not make a categorical denial, but determined that a Lyme disease diagnosis was not supported by substantial evidence. See D. 47 at 33 (concluding that "Mr. Dutkewych's complicated medical and psychological history evidence that he never had Lyme disease – let alone 'chronic Lyme' disease").[3]

---

[3]For similar reasons, the Court also does not conclude Dutkewych's reliance on another case, Hoffpauir v. Aetna Life Ins. Co., No. 06-1939, 2009 WL 1675975 (W.D. La. June 15, 2009), D. 45 at 14–15, warrants a different outcome. While Hoffpauir concluded that disability plan "cannot base its denial of benefits solely upon an expert report from a physician who does not recognize that a particular disease exists, and does not believe that patients suffering from functional somatic syndromes should have a treatment strategy," id., at *8, sole medical evidence supporting the plan's decision not to recognize fibromyalgia was from the single medical expert retained by the plan administrator who did not recognize that fibromyalgia was a disease. Id. at *3. By contrast, Standard relies upon three medical experts who, whatever their doubts about the

Along the same lines, Dutkewych's reliance on cases concerning chronic fatigue syndrome and fibromyalgia is unavailing. Many of those cases rested on the fact that insurance companies' erred in ignoring the best available methods of diagnosing these illnesses because for instance, they turn on self-reported symptoms, and thus, were difficult to diagnose. See D. 45 at 16–17 (citing, e.g., Sansevera v. E.I. DuPont de Nemours & Co., Inc., 859 F. Supp. 106, 113-14 (S.D.N.Y. 1994); Maronde v. Sumco USA Group Long-Term Dis. Plan, 322 F. Supp. 2d 1132, 1141 (2004). While Dutkewych contends that chronic Lyme disease is "based on self-reported symptoms," D. 45 at 17, he does not dispute the fact that there are also clinical indicia of the disease, generally accepted in mainstream medicine. D. 45 at 21.

### 3.    Weight Given to Treating Physicians' Opinions

Dutkewych next argues that Standard improperly discredited the opinions of his treating physicians who diagnosed him with Lyme disease. D. 45 at 19. While plan administrators may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," they also are not required to give deference to the opinions of treating physicians. Black & Decker, 538 U.S. at 834. "[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Id. That is, "it is not [the court's] role to evaluate how much weight an insurer should have accorded the opinion of an independent medical consultant relative to the opinions of a claimant's own physicians." Gannon v. Met. Life Ins. Co., 360 F.3d 211, 216 (1st Cir. 2004) (citing Matias-Correa v. Pfizer, Inc., 345 F.3d 7, 12

_____

existence of chronic Lyme disease, based their opinions on a lack of clinical indicia of Lyme disease for Dutkewych's diagnosis. R. 614, 616-17, 621.

(1st Cir. 2003)).  Therefore, Standard was not required to give deference to the opinions of Dutkewych's treating physicians who diagnosed him with Lyme disease.

    4.  *Standard's Decision is Supported by Substantial Evidence in the Record*

    The crux of the Plaintiff's claim is that the administrative record establishes that he was disabled by Lyme disease and that Standard intentionally classified Dutkewych's disability as a mental illness to avoid paying benefits past the Two Year Limitation, ignoring the possibility of a physical disability.  As discussed above, the Court's role here is to determine whether Standard's decision was "supported by substantial evidence in the record." <u>Leahy</u>, 315 F.3d at 17.  In so doing, the Court "tend[s] to resolve doubts" in the administrator's favor.  <u>Liston</u>, 330 F.3d at 24.  The Court is not empowered to provide a *de novo* review of Standard's decision. <u>Leahy</u>, 315 F.3d at 15 (applying arbitrary and capricious standard when benefit plan grants administrator discretionary authority to determine benefits eligibility). Therefore, "[e]vidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision." <u>Wright</u>, 402 F.3d at 74.  The Court "asks only whether a factfinder's decision is plausible in light of the record as a whole." <u>Leahy</u>, 315 F.3d at 17 (citations and quotations omitted).

    In light of this standard of review, the Court cannot conclude that Standard abused its discretion in relying upon the opinions of retained medical experts who analyzed the claimant's medical documentation and reached a different conclusion from his treating physicians. Dutkewych points to evidence suggesting that he had Lyme disease and, in fact, diagnosing him with Lyme disease.  In a letter dated August 2011, Dr. Ruiz stated that Dutkewych had tested positive for and suffered from Lyme disease for many years. R. 5172.  Dr. Shea recorded in the spring of 2011 that in his medical opinion, based on his training, education and experience,

Dutkewych's "cognitive difficulties is primarily based in the resultant neurologic sequela of Lyme disease with central nervous involvement." R. 2340. Further, Dutkewych tested positive for Lyme disease on multiple occasions under the IGeneX IGG criteria. R. 4570-72, R. 2543-56.

Standard, in "evaluat[ing] disability claims in the context of mainstream medical opinion," R. 631, chose to defer, however, to the opinion of its medical experts, who explained that the IGeneX criteria may lead to false positives. R. 634-36; R. 2761-62. Dr. Dattwyler concluded that Dutkewych never had Lyme disease because his testing never produced positive results for Lyme disease based on the CDC's criteria. R. 492-496. Dr. Dattwyler elaborated that the IGeneX test used to diagnosis Dutkewych in 2008 did not meet the CDC testing criteria and produced a high rate of false positive results. R. 493-95, 497. Additionally, Dutkewych never had the bull's eye-shaped rash on his skin that develops at the site of the tick bite in the vast majority of Lyme disease patients. R. 489. Dr. Dattwyler further noted that Lyme disease is "characterized by well-defined objective clinical abnormalities" and a review of Dutkewych's medical file did not show such "clinical manifestations." R. 488. Dr. Dattwyler also noted that although the initial diagnosis of Lyme disease is "largely a clinical diagnosis, this is not true after the first few weeks of infection." Id. Dr. Dattwyler then listed the "well-defined clinical manifestations associated with Lyme disease" per the CDC Lyme disease serology guidelines, which Dr. Dattwyler described as "the standard for all laboratories providing clinical services in the United States." R. 492. Dr. Dattwyler concluded that Dutkewych "does not have Lyme disease now and never did." R. 497.

Further, Dr. Gant, a neuropsychologist consulted by Standard, R. 638, concluded that Dr. Shea relied too heavily on chronic Lyme disease as the diagnosis and believed that Dr. Shea did not consider alternative explanations for Dutkewych's test results. R. 482. Dr. Gant agreed with

Dr. Dattwyler that chronic Lyme disease "is not accepted as a diagnosis in mainstream medicine." Id.

Although Dutkewych argues that the reviewing consultants' belief that chronic Lyme disease does not exist foreclosed the possibility the he could receive benefits for the condition, Dutkewych also recognizes that there remains a "contentious debate among health care providers" as to whether "chronic [Lyme disease] infection is rare or non-existent" or whether the "disease can be debilitating and persistent." D. 46 ¶¶ 28-30. As Dr. Statlender noted, only some experts believe that "blood tests should not be used to rule out Lyme disease when there is a strong clinical presentation." R. 2684. That Standard, in the wake of this developing area of medicine, relied upon the opinions that were more favorable to a denial of benefits does not amount to an abuse of discretion, in light of the substantial evidence in the record suggesting that Dutkewych did not have Lyme disease.

The Court finds Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79 (1st Cir. 2010) instructive. The plaintiff there challenged her disability insurer's decision to terminate her LTD benefits after two years based on a mental illness limitation similar to the one in Standard's contract. Id. at 81. That plaintiff also submitted evidence that her Lyme disease continued to disable her after two years and that physicians were split on whether the medical test results conclusively demonstrated that she suffered from Lyme disease at all. Id. at 85-86. The First Circuit, conducting de novo review, id. at 83, upheld the plan administrator's denial of LTD benefits. Id. at 86. First, the Court reviewed the CDC's recommended diagnostic testing procedures and concluded that the plan complied with that testing regimen and although a negative test might not "be completely diagnostic or definitive," such negative test for the disease "was corroborated" by other medical evidence in the record. Id. Second, the Court considered the

plaintiff's documented history of depression as a factor weakening the probability that she had Lyme disease, as the two medical conditions have many of the same symptoms, including difficulty sleeping, concentrating and fatigue.  Id.  As noted above, there is also substantial evidence in the record that Dutkewych suffered from non-physical impairments, such as depression.  See Schwob, 248 F. App'x at 29 (concluding that Standard did not abuse its discretion in denying LTD benefits based on Lyme disease, as there was substantial evidence that "a mental disorder contributed to [the claimant's] cognitive impairment" even if "the mental disorder resulted from Lyme disease or another physical disease").

For these reasons, the Court holds that Standard did not abuse its discretion in concluding that Dutkewych was not disabled by Lyme disease.

> **B.    Standard's Decision About Dutkewych's Life Insurance and the SSA's Determinations Do Not Render Standard's Determination Here Arbitrary and Capricious**

Dutkewych's also argues that Standard's denial of his Lyme disease diagnosis is unreasonable considering that Standard's life insurance claims department and the Social Security Administration have both recognized his Lyme disease.  D. 45 at 34.

First, SSA disability determinations generally are not binding on an ERISA analysis, as the two disability proceedings have different regulatory criteria.  Pari-Fasano, 230 F.3d at 420 (holding benefits eligibility determinations by the Social Security Administration are not binding on disability insurers); compare Scibelli v. Prudential Ins. Co. of Am., 666 F.3d 32, 36–37 (1st Cir. 2012) (finding SSDI decision relevant where LTD policy accepted "the receipt of SSDI benefits as evidence of total disability entitling a covered person to LTD benefits").  For instance, in Social Security cases, the administrative law judges generally afford greater weight

to opinions of treating physicians than non-treating physicians, 20 C.F.R. § 416.927(c)(2), which is not so in ERISA cases. <u>Black & Decker</u>, 538 U.S. at 834.

Second, with regard to the life insurance waiver, Standard's life insurance department not only recorded that Dutkewych was "totally disabled" due to Lyme disease in December 2011, R. 5160, and continued to administer his premium waiver past the termination of his LTD benefits in April 2011. The Court cannot conclude, however, that this discrepancy constitutes an abuse of discretion in the LTD determination. Under the waiver of premium, for a claimant to be "totally disabled," the claimant must be unable to perform "with reasonably continuity the material duties of any gainful occupation" "as a result of Sickness, accidental Injury, or Pregnancy." R. 3034. The LTD plan, however, required a "physical disease," as opposed to "sickness." R. 826. Further, the evidence provides no indication that Standard consulted reviewing experts or weighed medical evidence to make its waiver of premium determination. <u>Cf. Scibelli</u>, 666 F.3d at 44–45 (holding that "based on the relevant evidence in the administrative record, the Group Policy language, and the unexplained inconsistency in Prudential's award of benefits under the Individual Policy but denial of benefits under the Group Policy, [the claimant] was 'totally disabled' under the terms of the Group Policy"). In a letter dated September 20, 2011, Standard notifies Dutkewych, through counsel, that the waiver of premium and LTD contracts are "administered differently" and cited to the definition of "total disability" in the life insurance policy. R. 3034.

Accordingly, neither the SSA determination nor the premium waiver decision compels the conclusion that Standard abused its discretion in denying Dutkewych LTD benefits.

**C.** **Standard's Determination that Dutkewych Suffered From a Limiting Condition Does Not Alter the Court's Ruling**

The parties also dispute the propriety of Standard's initial decision to limit Dutkewych's benefits by finding that he suffered from a limiting condition. D. 45 at 29-33; D. 47 at 25-32. While the terms of the Plan allows Standard to pay benefits for a "limited pay period" if it finds that the claimant is "disabled as a result of a Mental Disorder or any Physical Disease or Injury for which payment of LTD benefits is subject to a limited pay period," the Plan also provides that at the end of that limited pay period, "[n]o LTD benefits will be payable . . . unless on that date you continue to be Disabled as a result of a Physical Disease, Injury, or Pregnancy for which payment of LTD benefits is not limited." R. 826. Therefore, regardless of whether a claimant is subject to a limited pay period in the first instance for a mental health or other limiting condition, Standard must re-assess, at the end of that limited pay period, whether the claimant continues to be disabled as a result of some other physical condition. As discussed above, Standard made that assessment here and found that Dutkewych did not have Lyme disease, R. 640, which is the physical disease on which he relies his claim for benefits. R. 2612.

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS the Defendant's motion for summary judgment, D. 43 and DENIES the Plaintiff's motion for summary judgment, D. 44.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge