1                   UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3    _____

4    MARK DUTKEWYCH,

5                        Plaintiff,        Civil Action
                                           No. 12-11073-DJC
6    v.
                                           December 12, 2013
7    STANDARD INSURANCE COMPANY,           2:18 p.m.

8                        Defendant.
     _____
9

10

11                  TRANSCRIPT OF MOTION HEARING

12              BEFORE THE HONORABLE DENISE J. CASPER

13                 UNITED STATES DISTRICT COURT

14              JOHN J. MOAKLEY U.S. COURTHOUSE

15                      1 COURTHOUSE WAY

16                     BOSTON, MA  02210

17

18

19

20
                       DEBRA M. JOYCE, RMR, CRR
21                      Official Court Reporter
                     John J. Moakley U.S. Courthouse
22                  1 Courthouse Way, Room 5204
                          Boston, MA  02210
23                      joycedebra@gmail.com

24

25

1    APPEARANCES:

2    FOR THE PLAINTIFF:

3    MALA M. RAFIK, ESQ.
     S. STEPHEN ROSENFELD, ESQ.
4    Rosenfeld Rafik & Sullivan, P.C.
     184 High Street
5    Suite 503
     Boston, MA 02110
6    617-723-7470

7    FOR THE DEFENDANT:

8    BROOKS R. MAGRATTEN, ESQ.
     Pierce Atwood LLP
9    72 Pine Street, 5th Flr.
     Providence, RI 02903
10   401-588-5113

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

(The following proceedings were held in open
court before the Honorable Denise J. Casper, United States
District Judge, United States District Court, District of
Massachusetts, at the John J. Moakley United States Courthouse,
1 Courthouse Way, Boston, Massachusetts, on December 12, 2013.)

THE CLERK:  Civil action 12-11073, <u>Mark Dutkewych v.</u>
<u>Standard Insurance Company</u>.

Would counsel please state your name for the record.

MS. RAFIK:  Good afternoon, your Honor.  Mala Rafik,
I'm here with Steven Rosenfeld for the plaintiff, Mark
Dutkewych.

THE COURT:  Good afternoon, counsel.

Good afternoon.

MR. ROSENFELD:  Good afternoon.

MR. MAGRATTEN:  Good afternoon, your Honor.  Brooks
Magratten for The Standard Insurance Company.

THE COURT:  Good afternoon, counsel.

Counsel, I know I have cross-motions for summary
judgment.  I have reviewed the papers, I'm prepared to hear
argument.  I actually don't recall which of them was filed
first, but I suppose we can start with the plaintiff, then I'll
give defense counsel, as well, an opportunity for argument.

MS. RAFIK:  Thank you, your Honor.  I wanted to just
note that my client is here in the courtroom, as well, today.

1          With your permission, your Honor, I'd like to reserve

2     two minutes for rebuttal.

3          THE COURT:  Sure.

4          MS. RAFIK:  Thank you.

5          So I intend to address three issues today, your Honor.

6     First, looking at the record as a whole, Mr. Dutkewych has met

7     his burden of proving that at the only relevant time at issue

8     in this case, June 2011, he was disabled due to a physical

9     condition, lyme disease, and the symptoms of that condition

02:20 10    alone.

11          Second, The Standard's conclusion that Mr. Dutkewych's

12     disability was due to mental illness or fibromyalgia is not

13     based on the substantial evidence in the record and should not

14     be given deference by this Court.

15          And third, your Honor, Standard's late-in-the-day

16     interpretation of the mental illness limitation is inconsistent

17     with its interpretation in this case and in other cases and is

18     a *post hoc* rationalization undeserving of deference.

19          First, and most important, your Honor, there is no

02:20 20    dispute in this case that Mr. Dutkewych is disabled.  He cannot

21     work in his own occupation as an attorney, and he cannot work

22     in any occupation.  Standard fully concedes this point.  The

23     record establishes that he suffers from a debilitating illness,

24     chronic lyme disease, or as the CDC calls it, post-treatment

25     lyme disease syndrome.  His symptoms really fall into two

1    camps, your Honor.  The first is cognitive limitations, and the

2    second are independently disabling physical symptoms, including

3    joint pain and swelling, otherwise known as joint arthritis;

4    fatigue; headaches; and visual disturbances; all of which are

5    consistent with the clinical picture of lyme.

6         When he first began exhibiting these symptoms, now

7    five years ago, lyme did not enjoy the same understanding in

8    medicine or the prominence in the media that it enjoys today.

9    And that really, your Honor, is the first tragedy of this case.

02:21 10        Mark suffered with worsening symptoms and worsening

11   pain with simply no relief, except the pain medication that was

12   constantly given to him to address the symptoms but really with

13   no insight as to their cause.  He, unfortunately, became

14   addicted to this pain medication.  Depression later set in

15   when, after seeing over 15 specialists, he was told by a

16   rheumatologist that he simply needed to will himself to get

17   better.  He was hospitalized, he underwent ECT treatment, and

18   lived in residential treatment facilities for several months

19   before being correctly diagnosed and treated.

02:22 20        After he began receiving IV antibiotic treatment for

21   lyme and an IV was inserted in both his arm and his chest,

22   Mark's mental health symptoms began to subside, and he has been

23   able to maintain sobriety since March 2010.

24        The second tragedy in this case is that Mark's

25   diagnosis came far too late.  By the time he began receiving

1  treatment, the lyme infection had destroyed Mark's body, the

2  body of a one-time American athlete, and it has destroyed his

3  brain, a mind that had led him to a successful career in public

4  finance at Mintz Levin.

5        Your Honor, Mark is now totally disabled due to

6  chronic lyme disease, and it's a total disability that

7  Standard's own life insurance department acknowledges is due to

8  chronic lyme.  Standard's disability division, however,

9  attempts to split hairs, simply in an attempt to avoid

02:23 10  liability.  It acknowledges that Mark suffers from physically

11  disabling symptoms, but it claims that chronic lyme just isn't

12  real.  As a result --

13        THE COURT:  But, counsel, isn't there a fair amount of

14  evidence in the record disputing that diagnosis?

15        MS. RAFIK:  Of chronic lyme, your Honor, with respect

16  to Mark or just generally?

17        THE COURT:  As to -- well, both, both.

18        MS. RAFIK:  Okay.

19        So let me take first the more general issue of chronic

02:23 20  lyme.  So there certainly is a political debate out there, your

21  Honor, regarding chronic lyme or there has been a political

22  debate.  I would say that the sands are very much shifting in

23  that regard.

24        In 2013, for instance, four cases dealt with the issue

25  of chronic lyme and whether chronic lyme existed and whether it

1    was disabling.  In all four cases the courts found, based on

2    the CDC criteria, that, number one, chronic lyme did exist; and

3    that, number two, the individuals were disabled as a result.

4         Similarly, in medicine you're seeing a constant change

5    in the way medicine is treating chronic lyme, as evidenced,

6    actually, in the medical literature we've included in this

7    record in this case.  But more importantly with respect to Mark

8    and really the four corners of this record, your Honor, there

9    are at least eight objective tests that support the existence

02:24 10   of chronic lyme.

11        The first is that Mark has been diagnosed on two

12   Western blot tests as having chronic lyme.  In the <u>Gent</u> case in

13   the 1st Circuit, the court found important that the plaintiff

14   had never been diagnosed on Western blot with lyme disease.

15   Mr. Dutkewych has two positive Western blot tests.

16        Second, and perhaps more importantly, Mr. Dutkewych

17   underwent a spinal tap at Brigham & Women's Hospital, it was

18   read at Brigham & Women's Hospital, and it showed elevated

19   protein in the fluid.  These results were -- this test was

02:25 20   really ordered by Mark's primary care physician, Dr. K.

21   Isselbacher, but the results shared with three lyme experts

22   that have no involvement in this case: a doctor from Johns

23   Hopkins, a doctor from Columbia School of Medicine, and a

24   doctor from Beth Israel.  All three of those doctors concurred

25   based on that spinal tap that Mr. Dutkewych had chronic lyme

1    disease and decided to insert is a port into his arm and treat

2    him with intravenous IV fluids.

3         There's a number of other tests, your Honor.  There's

4    a SPECT scan that shows diminished blood flow to the brain that

5    Dr. Raxlen, who is a lyme expert, he's treated over 4,000

6    individuals with lyme disease, he felt that the results of the

7    SPECT scan were consistent with chronic lyme.  There's an

8    abnormal EEG that was consistent with cerebral disorder that

9    was felt to be consistent with chronic lyme.  There is also --

02:26 10   there's also -- just one last point I'd like to make, there's

11   also Dr. Trempe, who's a Harvard professor, who found that Mark

12   had changes in his vision that's consistent with what he sees

13   with chronic lyme.  These are indisputable objective tests.

14        More importantly, your Honor, the CDC has said, and

15   they just revised their clinical definition of lyme, they have

16   said very clearly that lyme is a clinical diagnosis, it is

17   based on clinical exam.

18        So there are at least seven doctors who have examined

19   Mark and who have determined, based on his clinical

02:26 20   presentation, that he suffers from chronic lyme.

21        To answer your question, your Honor, on the other side

22   we have Drs. Dattwyler and Sigal, both of whom were retained --

23   both of whom were retained by Standard who found otherwise, and

24   they're really the contrary evidence that your Honor is

25   referring to.

1            THE COURT:  And isn't -- weren't there negative tests,

2      counsel?

3            MS. RAFIK:  There were.  There were a number of

4      negative ELISA tests.  So the way that lyme works is the first

5      test that's offered is the ELISA test.  It's often -- I think

6      the statistic -- it's in our brief -- but I believe it's over

7      60 percent inaccurate.  It often shows a false positive, it can

8      also show a false negative.  The next step is to go to the

9      Western blot, which is much more sensitive to the existence of

02:27 10     lyme.

11            But I do want to caution your Honor that the CDC has

12     said that while testing is helpful for the diagnosis, it is not

13     necessary to make a diagnosis of lyme.  And this is where I

14     think a lot of the misunderstanding has really occurred, both

15     in this case and in prior cases before this year.  The CDC

16     issues two separate sets of criteria, one is surveillance

17     criteria, and it's part of their attempt to sort of gather

18     information as to how many people nationally suffer from lyme.

19     The surveillance criteria require positive blood tests to

02:28 20     demonstrate the existence of lyme.  They're trying to capture

21     sort of -- they're trying to measure how many people have lyme

22     in the country.  On the other hand, they're very clear that the

23     diagnostic criteria do not require positive blood tests.  What

24     they require is a clinical examination.

25            It's important to note, your Honor, however, that

1    Mr. Dutkewych, in the record -- the record shows that

2    Mr. Dutkewych actually even meets the surveillance criteria.

3    When he was initially diagnosed with lyme by Dr. Hubbuch, she

4    sent his lyme -- the Western blot to the Mass. Department of

5    Public Health, who reviewed the results of the clinical exam

6    and the results of Western blot and certified that Mark met the

7    clinical criteria, the surveillance criteria, for chronic lyme

8    as established by the CDC, and sent his results on to the CDC

9    as a confirmed case of lyme.

02:28 10        THE COURT:  Counsel, I guess one of the questions I

11    have for you, and isn't this a similarity with the Gent case in

12    regards to isn't there evidence in the record here of a history

13    of other mental conditions and disorders that would weaken the

14    probability of lyme disease?

15        MS. RAFIK:  Thank you for asking that question, your

16    Honor.  I welcome the opportunity to respond to that.

17        Mark had a history of OCD.  It was diagnosed in 2004,

18    and it really manifested itself in a desire to be neat and

19    clean.  He sought treatment with Dr. Paul Serrano at MGH, and

02:29 20    in 2004 had a number of visits, I believe, like, 14 visits.

21    But as the years progressed, those visits diminished down to

22    one.  That was his history of mental illness.  He was also 2001

23    in a severe car accident, where a man on heroin killed somebody

24    else after crossing a median and Mark was hit by a car.  He

25    took Vicodin for six months or I think it was OxyContin for six

1    months to address his symptoms, he was flat on his back

2    following that accident; but after six months he proactively

3    engaged in a PT session three to four hours a day to get better

4    and he did and he was off his meds.  That's his history of

5    substance abuse and mental health treatment, although he had

6    some sporadic depression, but nothing -- depression with a

7    small D throughout life because of unhappiness with his job.

8    But that was it before he was bitten by a tick in 2007.

9              And what happened in 2007, your Honor, is that he

02:30 10   started having all these physical symptoms.  He was bleeding

11   from different orifices, he was having pain, he was dropping

12   things, he was clumsy, he was forgetting things, he was

13   extraordinarily tired, and he went from specialist to

14   specialist, rheumatologist to gastroenterologist; and all

15   anybody could say to him is, We don't know.  We can offer a

16   differential diagnosis but we really don't know what the cause

17   is.  And what every single doctor did is give him pain

18   medication, and it was that pain medication that caused him to

19   become addicted.  It was the only thing that he had that helped

02:31 20   his symptoms.  So when he was ultimately -- when he was

21   ultimately admitted to McLean Hospital, he said to McLean

22   Hospital, Substance abuse has been the biggest cause of the

23   problems in my life.  But what he was referring to was the

24   arrest that had occurred the day before and the substance abuse

25   that had destroyed his life in the year prior.  After all, he

1    had lost his job, he had lost his health, and he had been told

2    by doctors, We have no idea what's wrong with you.  But that

3    substance abuse and that depression that set in at that time

4    stood alone, your Honor, it wasn't a part of long-term history,

5    as Standard would like to portray Mark.  Certainly there are

6    references in the record to Mark doing drugs in college;

7    contrary to what Standard says, that drug use ended in college,

8    the records are very clear.  We've made those points in our

9    brief.  But this history of mental illness and substance abuse

02:31 10   occurred in the context of the missed diagnosis.  And when he

11   was correctly diagnosed, those symptoms subsided to the degree

12   that he went off Flexapro in 2010 because he was doing so well.

13   And he hasn't used, since March 2010, any substance for pain.

14         The second point I'd like to make just went right out

15   of my head, but there is a second point to answer your

16   question --

17         THE COURT:  But I guess, and I think there is a

18   difference in opinion between the parties in terms of what time

19   period I should be looking at.  I understand your argument to

02:32 20   be that I need to look at 2011.

21         MS. RAFIK:  That's right, June 2011.

22         THE COURT:  As of the condition of 2011.  What, if

23   anything, would you have me make of the decision about the

24   long-term disability claim being allowed in 2009 based on his

25   mental conditions?

1      MS. RAFIK:  Certainly.  And that was -- actually, you

2 took me right to the point I was going to make, your Honor.

3 The Gent case -- this is where the similarity is, in the Gent

4 case of course.  Mrs. Gent filed her claim based on psychiatric

5 conditions, as Mark did.  But the difference in the two cases

6 is one year later Mrs. Gent was diagnosed with lyme disease.

7 She was bitten by a tick one year into her claim.  She didn't

8 start her claim with lyme disease, she only had a mental

9 illness.

02:33 10      In Mark's case he started his claim with lyme disease

11 and with mental illness.  If you look at Standard, Standard has

12 a new claim intake form, and on their new claim intake form

13 when they approved Mr. Dutkewych's claim for short-term

14 disability, they made the point that his psychiatric condition

15 was more prominent at the time, which it most certainly was,

16 his doctors were attempting to deal with his depression and

17 addiction issues that had occurred in search of a cure, but it

18 was very clear in their notes that lyme had been referenced as

19 a possible cause of his symptoms.  He had started IV antibiotic

02:34 20 treatments -- not IV antibiotics, I'm sorry, oral antibiotics

21 at the time his claim was filed, and his physical condition

22 occurred at the same time, or the claim was filed with both in

23 mind.

24      The second point to make here, your Honor, is that

25 Mr. Dutkewych's lyme disease, physical condition, is, in fact,

1    what caused his addiction and his depression, unlike the Gent

2    case, they're completely isolated conditions.

3         Moreover, in the Gent case, your Honor, there was --

4    Mrs. Gent's own doctors couldn't concur as to what was causing

5    her symptoms.  Some of her own doctors thought that her illness

6    was due to mental illness as opposed to lyme disease.

7         In Mr. Dutkewych's case there are three psychiatric

8    providers, Dr. Statlender, Dr. Raxlen, and Dr. Shea, and all of

9    whom have opined that Mr. Dutkewych does not suffer from

02:34 10   disabling mental health conditions, period.

11        More importantly, The Standard's only psychiatric

12   reviewer, and he was a neuropsychologist, Dr. Gant, is the only

13   doctor that Standard retained to review the entire file.  He

14   stated unequivocally that he could not -- that there was no

15   limitations due to a psychiatric condition, and that he could

16   not render a determination as to whether or not Mr. Dutkewych

17   even had a psychiatric condition that was disabling.

18        There's not one shred of evidence in this record, your

19   Honor, that supports a finding that Mr. Dutkewych -- by any

02:35 20   doctor -- was disabled as of June 2011 from a psychiatric

21   condition, unlike the Gent case.

22             THE COURT:  Okay.

23             MS. RAFIK:  I will make one more point, your Honor --

24             THE COURT:  Can I just interrupt?

25             MS. RAFIK:  Oh, of course.

1          THE COURT:  I recall that Social Security has made a

2     determination of disability, and what was the timing of that?

3     What was the -- both the timing of that decision and what time

4     period does it cover?

5          MS. RAFIK:  So we applied for Social Security for

6     Mr. Dutkewych immediately at the time he became disabled, so we

7     handled his application, and that was in early 2009 is when his

8     application went in.  Social Security Administration found in

9     2010, and I believe it was in June of 2010, that Mr. Dutkewych

02:36 10    suffered from -- was disabled due to both depression and due to

11     lyme disease.  But what they said -- and both conditions were

12     severe.  The medical records that they had to make the

13     determination regarding the depression, and they list this in

14     the opinion that's in the record, your Honor, is his

15     psychiatric treatment records from McLean Hospital and from

16     Cambridge Hospital that were in 2008 and early in 2009.  They

17     didn't have anymore current psychiatric records.  The lyme

18     disease they found to be severe, but they felt, or Judge Fallon

19     felt that his psychiatric condition would probably resolve

02:36 20    within a year, and that was clear in the opinion.

21          THE COURT:  Thank you.

22          MS. RAFIK:  You're welcome, your Honor.

23          So if I may, your Honor, I'd like to make just --

24     you've actually helped me with my second point, but I'd like to

25     make just a couple of more points with respect to Standard's

1    discretion and its reliance on Dr. Sigal, Dr. Dattwyler, and

2    Dr. Gant.

3         Dr. Sigal, Dr. Sigal's entire report is sort of based

4    on the promise that chronic lyme doesn't exist.  He cites to no

5    authority in that regard, and he does nothing to refute

6    Mr. Dutkewych's treatment providers' diagnosis of lyme, except

7    to say there's this whole group of doctors out there that make

8    a living out of telling people they have chronic lyme when they

9    really don't.

02:37 10         Mr. Dutkewych's treatment providers span the entire

11   gamut up and down the East Coast, and it really defies logic to

12   think they're in cahoots together to make money off of

13   Mr. Dutkewych.  Regardless, Dr. Sigal provides no medical

14   support for his report.

15         Dr. Dattwyler is really the more sort of thorough

16   report here in this case that Standard based its decision on.

17   I was looking at Dr. Dattwyler's report today.  He has about 45

18   different citations, 45 different footnotes, and the vast

19   majority of those footnotes are from medical research that was

02:38 20   done in the 1990s.

21         For instance, Dr. Dattwyler says -- and this is a big

22   part of his claim that Mr. Dutkewych never had lyme -- he said,

23   Well, Mr. Dutkewych never had the rash, the EM rash that is

24   required to diagnose lyme.  He says that happens in 90 percent

25   of people.  The citation he uses is from 1998.  The CDC said in

1   2011 and it's as of today, I checked its website today, that 70

2   to 80 percent of people never -- get the rash but the rest

3   don't.  And in fact, for the surveillance criteria, actually

4   having the rash is not necessary for a diagnosis of lyme.

5        Moreover, he says you have to have -- that psychiatric

6   manifestations of lyme aren't credible, they don't exist.

7   Again, he's citing to case studies from the 1990s.  That's been

8   absolutely reputed.  The medical evidence in the record from

9   the late 2000s says quite otherwise.

02:39 10        He also says that neurological lyme disease is rare

11   based on investigations from 2001 to 2006.  Just this year the

12   CDC says we've been underestimating by 300,000 the number of

13   people who have lyme.

14        The problem with Dr. Dattwyler's report, your Honor,

15   is that his medicine is outdated.  And he ultimately never

16   deals with the clinical -- with Mark's clinical picture.  He

17   makes three references in his report that Mark doesn't meet the

18   clinical picture of lyme, but if you look at his report, he

19   never explains why.  Three times he makes that blanket

02:39 20   statement, but he never says, Well, what symptoms does Mark

21   have that don't meet the clinical picture?  In fact, Mark's

22   doctors, Dr. Raxlen, Dr. Hubbuch, Dr. Ruiz, both painstakingly

23   did clinical evaluations of Mark and said, He meets the

24   clinical picture of lyme, he meets the picture that we see in

25   the thousands of patients that we see with lyme disease, and he

 1    meets the clinical picture as supported by the CDC.

 2          The 1st Circuit has sort of repeatedly said, Look, if

 3    there's contrary evidence in the file, discretion always wins,

 4    discretion is the trump card, but it has also very clearly said

 5    that you have to acknowledge and respond to the contrary

 6    medical evidence.  It's not enough to say -- to throw up your

 7    hands and say, Well, there's conflicting evidence, we win,

 8    discretion trumps.  You have to actually deal with the evidence

 9    that's in front of you, and I actually think --

02:40 10          THE COURT:  Even if, as you suggest, the medical

11    studies and medicine's understanding of the condition have

12    evolved since Standard made its decision?

13          MS. RAFIK:  Yes.  But, your Honor, the medical studies

14    are in the record.  So the medical studies that we cite to are

15    in the record.  Certainly the 300,000-person cite I just made

16    to your Honor is not in the record, but everything else I've

17    said is in the record.  And we have included in the record

18    medical literature from the late 2000s that supports the

19    existence of chronic lyme, unequivocally supports it.

02:41 20          Your Honor, Judge Woodlock just recently in Petrone

21    said -- when thinking about this concept of conflicting medical

22    evidence and discretion, he said, An administrator cannot

23    simply ignore contrary evidence or engage only with that

24    evidence which supports his conclusion.  In our opinion, your

25    Honor, that's precisely what happened here.  If you look at

1    Dr. Dattwyler's and Sigal's reports, they don't ever look at

2    Dr. Raxlen's record or Dr. Raxlen's clinical evaluations or

3    Dr. Ruiz' or any of the evidence set forth by Mark.  They

4    simply take the evidence -- they simply just write off the

5    doctors as quacks hurrying to make some money, but they never

6    deal with the evidence, and that's the problem with their

7    reviews here.  It's not enough.  You can't hide behind the

8    shield of discretion, unless you do the review that's required

9    by ERISA.

02:42 10         So just one final point, if I may, your Honor --

11         THE COURT:  Yes.

12         MS. RAFIK:  -- at the 11th hour The Standard raised in

13    its reply brief a new argument that hasn't been raised before

14    in this case.

15         So they said that if you have cognitive limitations

16    that are disabling, regardless of their cause, whether it's

17    physical or mental, then your case is limited to two years of

18    benefits under this plan.

19         This is a *post hoc* rationalization, your Honor, and

02:42 20    the 1st Circuit in Glista v. Unum shut down such *post hoc*

21    justifications, that the insurance company can't come up with

22    any justification at any time to justify the denial of

23    benefits.

24         During the internal appeals process in this case, I

25    specifically asked the appeals handler, Linda Wheeler, I asked

1    her, If someone has cognitive limitations that are derived from

2    a physical cause, does that -- is that claim limited to two

3    years?  And she said, No.  Her notes are very clearly detailed

4    in the file, they've been cited in our briefs, and I have

5    copies here today.  But she said, If you have cognitive

6    limitations that are due to a physical cause, whether it's lyme

7    disease or cancer, then you have a physical disease or injury

8    that is payable beyond two years.

9         The Standard now argues in its brief that she's wrong.

02:43 10   She is not a lawyer, she's wrong, even though she was the

11   person responsible for interpreting the policy and the plan in

12   this case.  But what doesn't make sense here, your Honor, is if

13   The Standard's interpretation is correct, their late-in-the-day

14   interpretation is correct, there simply wouldn't have been any

15   need to further investigate Mark's case after the neuropsych

16   testing that was done by Dr. Shea in May 2011 found him to be

17   totally disabled from cognitive limitations of lyme.  The case

18   should have stopped there.  There would have been no need to

19   spend $25,000 on Dr. Dattwyler and on Dr. Gant's review to

02:44 20   determine the cause of Mr. Dutkewych's cognitive limitations,

21   it would have been unnecessary.

22        Similarly, such an interpretation of the policy is

23   nonsensical.  It would mean that anybody who suffers from any

24   sort of physical condition that causes disabling cognitive

25   limitations, whether it's cancer, a traumatic brain injury,

1   would be limited to two years of benefits.  It's not what the

2   policy calls for, it's not in the contract.

3        Your Honor, in preparation for this argument, I went

4   to Pacer and I tried to pull as many cases that I could find

5   where this issue had come up, this policy provision.  What I

6   did pull was the case where all the briefs in the Schwob case

7   that Standard cites to where this provision was at issue, and I

8   found another case called Oster that was decided in 2011 where

9   the man did, in fact, suffer from a traumatic brain injury and

02:45  10   his only disabling symptoms were cognitive.  In neither one of

11   those cases did The Standard raise the policy interpretation

12   it's now raising at the 11th hour in this case.  Because it's a

13   *post hoc* rationalization, because it's ERISA implementing

14   regulations that require meaningful dialogue during the

15   internal appeals process, this Court cannot just give deference

16   to this new policy interpretation by The Standard.

17        THE COURT:  What relief do you seek here?  Meaning,

18   are you seeking remand or -- is that what you're seeking?

19        MS. RAFIK:  No, your Honor.  We're seeking an award of

02:45  20   benefits here, and I'll tell you why remand is inappropriate in

21   this case.

22        If your Honor determines -- well, let me start here.

23   There's no dispute that Mr. Dutkewych is disabled, unlike the

24   vast majority of ERISA cases your Honor likely sees.  So if

25   your Honor determines that chronic lyme could have caused or

1   caused Mr. Dutkewych's disability, then there's simply no

2   reason to remand this case, benefits can be awarded.

3            Secondly, your Honor, this case is 51 pages -- 5,100

4   pages long.  There's no dispute here.  There's no claim that

5   there is a procedural irregularity that would necessitate a

6   remand.  The record is what the record is, and if Mr. Dutkewych

7   is disabled, then, as Standard's Life Insurance Division says,

8   it's due to chronic lyme disease, then he should be awarded the

9   benefits he is due.

02:46 10           Thank you, your Honor.

11           THE COURT:  Thank you, counsel.

12           Counsel, I'll hear from you.

13           MR. MAGRATTEN:  Thank you, your Honor.

14           The case presents a very long and detailed factual

15   record, but the legal issue, I think, is fairly narrow.  The

16   parties have briefed the facts on this extensively.

17           It's clear that Mr. Dutkewych, in some respects, has

18   been quite accomplished, both as an athlete and as an associate

19   who was employed in one of the larger firms in town.  In other

02:47 20   respects, however, he's been burdened with a terrible history

21   of depression, anxiety, drug addition leading to criminal

22   convictions, obsessive-compulsive disorder, and fibromyalgia.

23   His history includes both inpatient and outpatient psychiatric

24   hospitalization programs, self-mutilation, and contemplated

25   suicide.

1          His last day of work as an associate was October 3 of

2    2008.  He applied to Standard for benefits under their

3    long-term disability plan, and there's no dispute Standard paid

4    for two years and then terminated benefits under the

5    disability's subject-to-limited-pay-periods provision of the

6    policy.

7          I think it's important at this point to take a step

8    back and ask a fundamental question:  Why at the end of that

9    two-year period was Mr. Dutkewych disabled from working as an

02:48 10   attorney?  And the argument is never raised that he was

11   incapable at that point in riding the T into work or sitting at

12   a desk.  The argument has been consistently presented in the

13   administrative record that Mr. Dutkewych could not work at that

14   time because of cognitive dysfunctions.  He wrote Standard on

15   April 27, 2011, about a month before benefits were terminated,

16   in which he stressed that cognitive issues are often the most

17   troubling for me.  He added, Despite working with my therapist

18   weekly and taking anti-depressant medications, depression and

19   anxiety continue to be an issue.  And if you examine the record

02:48 20   from the perspective of the medical treatment and attention

21   that was given at that time, it was all based on his cognitive

22   difficulties.

23          THE COURT:  And I guess -- I guess, counsel, my

24   question is, isn't there evidence in this record that that

25   mental condition may not be the cause but may be the symptom of

1       this other physical condition, of the chronic lyme disease?

2              MR. MAGRATTEN:  That is certainly the argument.  That

3       is certainly the argument, your Honor.

4              The -- if I can try to focus the dispute here a little

5       bit, the -- really the parties are arguing on one page of the

6       policy, of the plan.  It's in administrative record, it's page

7       826, the provision about disability is subject to limited pay

8       periods.  This section states that disabilities based on mental

9       disorders, which are broadly defined to be any mental,

02:49 10    emotional, behavioral, psychological, personality, cognitive,

11      mood or stress-related abnormality, et cetera, are limited to

12      24 months.  There is also a restriction for chronic fatigue

13      conditions such as fibromyalgia.  And there's no dispute

14      between the parties that Standard paid two years under that

15      provision, and from the outset Standard cautioned Mr. Dutkewych

16      that the claim may be subject to this limited pay period.  In

17      the end, Standard terminated benefits because of the limited

18      pay period.

19             The key provision is at the bottom of the page, there

02:50 20    is a provision that says, Rules for disabilities subject to

21      limited pay periods.  And what it says is if you are disabled

22      as a result of a mental disorder or any physical disease or

23      injury for which payment of benefits is subject to a limited

24      pay period and at the same time are disabled as a result of a

25      physical disease, injury or pregnancy that is not subject to

1  such limitation, LTD benefits will be payable first to the

2  conditions that are subject to the limitation.  No LTD benefits

3  will be payable after the end of the limited pay period unless

4  on that day you continue to be disabled as a result of a

5  physical disease, injury or pregnancy for which payment of LTD

6  benefits is not limited.

7          So clearly the plaintiff's focus here is to say, Yes,

8  my condition is a mental disorder; however, because the root

9  cause is not just lyme disease, but chronic lyme disease, that

02:51 10  underlying physical condition carries me beyond the two years.

11  And they really -- this proposition rests on three -- excuse

12  me -- the argument rests on three propositions.  The first is

13  that chronic lyme disease exists, and the plaintiff in briefs

14  makes his argument forcefully.  And I would add, as well,

15  references to the CDC's website as of today and some other

16  references in the brief are clearly outside the administrative

17  record and should not be considered by this Court.

18          THE COURT:  But even among the folks, or rather the

19  doctors and psychologists and the other specialists here, there

02:52 20  seems to be some disagreement.  Meaning, that even putting

21  aside any reference to materials that might be outside of the

22  record, there seems to be some dispute among the treating

23  doctors and the reviewing doctors about whether or not this is

24  actually a condition; is that --

25          MR. MAGRATTEN:  Correct.  And I think the plaintiff,

1    for a number of reasons, would like a judicial stamp of

2    approval on the diagnosis of chronic lyme disease, and

3    Standard's position is that is not an issue this Court needs to

4    decide, it's not an issue this Court should decide.  That is an

5    issue for medical science to decide in the fullness of time on

6    a fact record much bigger than what's presented in this case.

7    The Court does not need to consider this because it's -- given

8    the deferential standard of review, it's not really for the

9    Court to weigh the evidence between --

02:53 10       THE COURT:  No, I understand your point in regards to

11   the deference I'm required to apply here, but here, as your

12   sister argued, it appears that the initial application for

13   disability benefits cited not only mental condition but this

14   lyme disease condition, and there appears to be, based on the

15   record, not on anything outside the record, but based on the

16   record to be some developing opinion among at least the

17   plaintiff's treating doctors about the effects of lyme disease.

18        So even without reaching the question of whether or

19   not this diagnosis exists as a matter of medical science, isn't

02:54 20   there enough here to say that there was an abuse of discretion

21   in terms of treating something as a cause versus a symptom of a

22   physical condition?

23       MR. MAGRATTEN:  No, because of the wording of the

24   plan.  I think we're getting to the real heart of the issue

25   here.

1              The policy defines mental disorder as any mental,

2    emotional, behavioral, psychological, personality, cognitive,

3    mood or stress-related abnormality, et cetera.  It goes through

4    the long list, but the important qualifier says, regardless of

5    cause, including any biological or biochemical disorder or

6    imbalance of the brain or the presence of physical symptoms.

7              So let's step back and assume for the moment, yes,

8    Mr. Dutkewych had chronic lyme disease for sake of argument,

9    and let's assume that chronic lyme disease produced cognitive

02:55 10    dysfunction which is what prevents him from working as an

11    attorney today.  Under the language of the definition of mental

12    disorder, it doesn't matter, it doesn't matter.

13              And now we get to, I think, what is the nub of the

14    matter that Ms. Rafik alluded to.  In the brief she writes she

15    called the disability analyst at Standard, who is not an

16    attorney, asked the question, Well, what happens if he does

17    have this lyme disease and it's lyme disease that's continuing,

18    does the 24-month limitation apply?  The key part of the

19    administrative record, there are two documents I think the

02:56 20    Court should review.  One is an internal handwritten memorandum

21    by the analyst, and that appears in administrative record at

22    page 722, and in this handwritten memo the analyst refers to

23    that telephone conversation.  There is also a letter from

24    Ms. Rafik to Standard, which appears in the administrative

25    record at page 649.  And if the Court looks at the two

1    documents, I think the Court will conclude that it's not at all

2    clear that Ms. Rafik and the analyst came to a common

3    understanding of what the plan does.  But even for sake of

4    argument, let's assume the analyst said, You're correct, if

5    lyme disease is the underlying problem, the 24-month limitation

6    will not apply.  That's not what the plan says, plainly and

7    simply.

8         THE COURT:  And what do you say about your sister's

9    argument that this is a *post hoc* rationalization that I

02:57 10  shouldn't reply upon?

11        MR. MAGRATTEN:  This is not Glista; this is the plain

12   language of the policy and the plan.  The plan also provides

13   the plan will not be amended, except in writing, signed by a

14   senior executive of Standard, plainly not the case here.  And

15   also, if the Court examines the Glista case -- I'm sorry, not

16   Glista -- Livick v. Gillette, where you have a claimant who

17   called an administrator, received an erroneous estimate of

18   benefits and Mr. Livick pressed his claim, and if he were to

19   prevail, it would essentially result in a rewriting of the

02:58 20  plan, which the 1st Circuit refused to do.

21        I think in the circumstances here, at best you get --

22   the Court is presented with two different stories of what was

23   said in that phone conversation, and in a case of this type,

24   where it's fundamentally a review of the administrative record,

25   it's inappropriate for the Court to engage in the kind of

1    fact-finding to determine what was really said in that

2    conversation.

3        At the end of the day, to apply the plan as the

4    plaintiff has asked it to be applied would require a rewriting

5    of the plan, which contravenes a great body of ERISA

6    jurisprudence.  The ERISA jurisprudence states foremost the

7    court's function is to apply the terms of the plan.

8        The relevant issue here is really the application of

9    the limited pay provision and the rules provision at the bottom

02:59 10    of that page.  Should the Court determine that the rules

11    provision had been inappropriately applied and that the claim

12    should be administered beyond two years, the appropriate remedy

13    at that point would be a remand to the administrator to

14    consider the claim beyond the two-year period, because on this

15    administrative record, that's all that has occurred to date, is

16    administration of the claim through the two years.

17        THE COURT:  Thank you, counsel.

18        MR. MAGRATTEN:  Thank you, your Honor.

19        MS. RAFIK:  May I, your Honor?

03:00 20        THE COURT:  Yes.

21        MS. RAFIK:  I'd like to address the policy provision,

22    the policy language regarding the mental illness limitation.

23    There's two points to be made here.

24        First, your Honor is correct, if Mr. Dutkewych's

25    mental illness stems from his lyme disease, then the mental

1    illness limitation comes into play, but it only comes into play

2    if Mr. Dutkewych's mental illness symptoms caused or

3    contributed to his disability.  And those are the operative

4    words.  As of June 2011, mental illness did not cause or

5    contribute to Mr. Dutkewych's disability.  He may have had

6    symptoms of anxiety and depression, but neither Standard's

7    doctors nor Mr. Dutkewych's doctors have ever opined that he

8    was disabled as a result of a mental disability, whether it was

9    caused by lyme or not.

03:00 10          The second point to be made is the cognitive

11    limitations.  So the policy -- the mental illness limitation

12    very clearly says cognitive limitations, regardless of cause.

13    That's in the language, your Honor, which is what prompted me

14    to talk to Linda Wheeler during the internal appeals process.

15          Now, I appreciate that we wouldn't have been going

16    through the entire exercise we would have been going to

17    determine the cause of Mr. Dutkewych's symptoms if the policy

18    was interpreted in any way that we have set forth to your

19    Honor.  But Ms. Wheeler, and I quote, says, Discussed the

03:01 20    presence of cognitive complaints alone would not cause benefits

21    to continue to be beyond mental disorder limitation.  There

22    would have to be evidence that these difficulties were due to a

23    physical condition, such as a head injury, for benefits to

24    continue.  And you can replace head injury with lyme disease.

25          Finally, your Honor, Mr. Magratten stated that the

1    entire case really revolves around Mr. Dutkewych's cognitive

2    limitations.

3            As Mr. Dutkewych has repeatedly stated in his

4    affidavits, as his doctors have repeatedly stated in their

5    statements, and I refer you to Dr. Ruiz' report on page 1746 of

6    the record or Dr. Raxlen's report, summary report, they list a

7    slew of physical complaints before they even get to his

8    cognitive disability.  Mr. Dutkewych suffers from fatigue and

9    lethargy, pain and weakness and stiffness, joint swelling and

03:02 10    pain, joint arthritis, sleep difficulties, night sweats, weight

11    loss, before you even get to cognitive limitations.  And we

12    have always alleged that those symptoms are independently

13    disabling for Mr. Dutkewych.

14            My final point is that Paul Blatchford, an independent

15    vocational examiner, did independent testing of Mr. Dutkewych,

16    and what he found during that testing is that Mr. Dutkewych,

17    who suffers from a tremor in his hand and pain and stiffness in

18    his hand, could not use a pencil to handwrite.  I would submit

19    to your Honor that one needs their hands as an attorney to

03:02 20    handwrite, to use a mouse, to use a computer.  It was --

21    it's -- the medical evidence, the physical evidence, even if we

22    take the cognitive out of it, your Honor, disables

23    Mr. Dutkewych from performing the duties of his own occupation.

24            THE COURT:  What about your brother's final point

25    about if I were to agree with you, the appropriate remedy is

1    remand?

2         MS. RAFIK:  Because -- actually, your Honor, there is

3    medical evidence in the record past the two-year point.  The

4    two-year point ended on June 2011.  The Standard has in its

5    possession medical records through 2012, through the beginning

6    of 2012 for Mr. Dutkewych --

7         THE COURT:  But has it done a review of that period of

8    time?

9         MS. RAFIK:  They haven't, your Honor.  But I would say

03:03 10    that this happens in virtually every ERISA case, and 90 percent

11    of those cases we don't defer to a remand because The Standard

12    hasn't had an opportunity to review updated medical records.

13    The proper remedy is to award retroactive benefits and

14    reinstate benefits under the terms of the plan.  At that point

15    in time, the insurance company can then review medical records

16    and determine if the individual still continues to be disabled.

17    That has been the remedy in ERISA cases since these cases

18    started to be litigated.  And usually remand is used when

19    there's been a procedural irregularity or misapplication or

03:04 20    misinterpretation of the policy provision.

21         THE COURT:  Thank you.

22         Counsel, do you want to jump in?

23         MR. MAGRATTEN:  Yes, your Honor, because the parties

24    have cross-moved.

25         THE COURT:  Yes.

1          MR. MAGRATTEN:  I think the argument that there is a

2    physical disability that exists as of June 2011 is a relatively

3    new argument.  Yes, there are medical records in the file that

4    talk about swollen joints and other physical issues, but that

5    is a far, far cry from substantial medical evidence that

6    Mr. Dutkewych was unable as of that time to do the physical

7    requirements of a sedentary job such as being an attorney.

8          Again, if you focus on the -- what the treating

9    physicians are concerned with at that time, I think it's

03:04 10    clearly the cognitive issues, and by Mr. Dutkewych's own

11    admission in his letter to Standard, that is his biggest

12    problem.

13          Thank you.

14          THE COURT:  Thank you.

15          Thank you, counsel, for your advocacy on either side

16    of this issue today.

17          As I indicated, I had a chance to review the papers,

18    but I'll go back and review them again with your arguments in

19    mind.

03:05 20          Thank you very much.

21          THE CLERK:  All rise.

22          (Court adjourned at 3:05 p.m.)

23              - - - - - - - - - - - -

24

25

```
 1                          CERTIFICATION

 2          I certify that the foregoing is a correct transcript

 3   of the record of proceedings in the above-entitled matter to

 4   the best of my skill and ability.

 5

 6

 7

 8   /s/Debra M. Joyce_____          May 20, 2014_____
     Debra M. Joyce, RMR, CRR         Date
 9   Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```