# United States Court of Appeals
## For the First Circuit

No. 14-1450

MARK DUTKEWYCH,

Plaintiff, Appellant,

v.

STANDARD INSURANCE COMPANY,

Defendant, Appellee,

and

MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO P.C. GROUP
LONG TERM DISABILITY PLAN,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Lynch, Chief Judge,
Souter,* Associate Justice,
and Stahl, Circuit Judge.

Mala M. Rafik, with whom S. Stephen Rosenfeld was on brief,
for appellant.
Brooks R. Magratten, with whom Ronald M. LaRocca and Pierce
Atwood LLP were on brief, for appellee.

---

* Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

---

March 30, 2015

---

         **LYNCH,** **Chief Judge**.    Plaintiff Mark Dutkewych is a
participant in a disability plan (the "Plan"), insured and
administered by Defendant Standard Insurance Company under the
Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001
<u>et seq</u>.  The Plan limits long-term disability ("LTD") benefits to
24 months for "a Disability caused or contributed to by . . . :
(1) Mental Disorders; (2) Substance Abuse; or (3) Other Limited
Conditions."  Applying this Limited Conditions Provision, Standard
terminated Dutkewych's benefits after 24 months, on June 1, 2011.
After Dutkewych's administrative appeal failed, he brought this
lawsuit against Standard for unpaid benefits.  The district court
entered summary judgment against Dutkewych's claims.  <u>Dutkewych</u> v.
<u>Standard Ins. Co.</u>, No. 12-cv-11073, 2014 WL 1334169 (D. Mass. Mar.
29, 2014).  Dutkewych appealed.

         Dutkewych contests Standard's decision to limit his LTD
benefits to 24 months, saying he has been diagnosed with chronic
Lyme disease, "a physical illness that is not limited under the
terms of the Plan."  Despite the hot dispute between the parties on
this issue, this case does not turn on the insurer's doubts about
the validity of Dutkewych's diagnosis with <u>chronic</u> Lyme disease.
Instead, this case turns on the insurer's application of a
different provision of the Plan, the subset of the Limited
Conditions Provision related to mental disorders ("Mental Disorder
Limitation").  Standard maintains that, even if Dutkewych was

-3-

disabled as a result of chronic Lyme disease in June 2011, the Mental Disorder Limitation nonetheless applies because his mental disorders, regardless of their cause, contributed to his disability as of June 2011.

Standard's interpretation of the Mental Disorder Limitation is reasonable and its application to Dutkewych's case is supported by substantial evidence. We affirm the entry of summary judgment to Standard.

### I.  Factual Background

A.    Standard's LTD Plan

The Plan provides that a participant qualifies as "Disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy, or Mental Disorder:"

> 1.  You are unable to perform with reasonable continuity the Material Duties of your Own Occupation; and
>
> 2.  You suffer a loss of at least 20% in your Indexed Predisability Earnings when working in your Own Occupation.

The "Maximum Benefit Period" allowed Dutkewych to receive benefits to age 65.

Certain disabilities, however, are subject to a limited benefits period ("Limited Conditions Provision"). Specifically, "[p]ayment of LTD Benefits is limited to 24 months during your entire lifetime for a Disability caused or contributed to by any one or more of the following . . . : (1) Mental Disorders; (2)

-4-

Substance Abuse; or (3) Other Limited Conditions." "Mental Disorders" is defined to include "any mental, emotional, behavioral, psychological, personality, cognitive, mood or stress-related abnormality, disorder, disturbance, dysfunction or syndrome, regardless of cause . . . or the presence of physical symptoms." "Other Limited Conditions" is defined to include chronic fatigue conditions and chronic pain conditions, such as fibromyalgia.

The Plan provides two "Rules for Disabilities Subject to Limited Pay Periods":

> 1. If you are Disabled as a result of a Mental Disorder or any Physical Disease or Injury for which payment of LTD Benefits is subject to a limited pay period, and at the same time are Disabled as a result of a Physical Disease, Injury, or Pregnancy that is not subject to such limitation, LTD Benefits will be payable first for conditions that are subject to the limitation.

> 2. No LTD Benefits will be payable after the end of the limited pay period, unless on that date you continue to be Disabled as a result of a Physical Disease, Injury, or Pregnancy for which payment of LTD Benefits is not limited.

Standard specified in the Plan that it "ha[s] full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy."

B.       Dutkewych's Disability

In early 2008, Dutkewych suffered from mental illness, substance abuse, and a dizzying array of physical symptoms that have since received competing diagnoses.  Dutkewych left his work as an associate attorney at a Boston law firm on October 3, 2008, and sought LTD benefits from Standard.  We summarize here the relevant chronology of Dutkewych's medical history and Standard's decisions concerning his benefits.

1.    Dutkewych's Early Diagnoses

In March 2008, Dutkewych began to experience symptoms including "severe fatigue, intense back pain and stomach irritation."  His symptoms worsened over the summer as Dutkewych developed a painful rash, began bruising and bleeding, suffered severe joint pain, and experienced cognitive issues, including trouble with reading comprehension, concentration, short term memory, directions, organization, and sense of time.  His primary care physician, Dr. Eric Serrano, did not identify a cause.

In August 2008, Dr. Serrano referred Dutkewych to a hematologist-oncologist, Dr. Brenda Haynes, who considered the possibility of Lyme disease.  At that time, Dutkewych reported "no recent viral exposure or tick exposure that he [was] aware of."  A blood test returned negative results for Lyme disease, but the test results warned that false negatives are possible in the early

-6-

stages of the disease before the patient produces detectable levels of antibodies.

Dr. Serrano then referred Dutkewych to a rheumatologist, Dr. Don Goldenberg, who examined Dutkewych in September 2008. Dr. Goldenberg concluded that Dutkewych's "musculoskeletal symptoms are consistent with what is termed fibromyalgia, which overlaps significantly with mood and sleep disturbances." Dr. Goldenberg noted that Dutkewych had a history of obsessive compulsive disorder, which made it "likely that unexplained physical symptoms with multiple physician evaluations would heighten the intensity of the symptoms." He recommended Dutkewych's treatment "be primarily regulated by [his] psychiatrist."

One week later, Dutkewych visited the psychiatric emergency department at the Cambridge Hospital. He reported his mental health history and his more recent somatic symptoms. He noted his recent diagnosis by Dr. Goldenberg, and attributed his worsening depression to the idea that his doctors did not want to pursue his physical symptoms. At that time, his wife reported that he was "self-medicating" with prescription drugs. Dutkewych was admitted to the Cambridge Hospital's Partial Hospitalization Program, an outpatient program, for the following two weeks. At discharge, he was diagnosed with major depressive disorder, obsessive compulsive disorder, and generalized anxiety disorder.

Case 1:12-cv-11073-DJC Document 80   Filed 03/30/15 Page 8 of 34

In November 2008, Dutkewych visited a family
practitioner, Dr. Jeanne Hubbuch, who ordered additional tests for
Lyme disease. This time, Dutkewych reported experiencing no tick
bites, but noted that ticks had been seen in his house. Western
blot test returned positive results for Lyme disease under the
IGeneX IGG criteria, but negative results under CDC/NYS and Babesia
FISH criteria.

On December 9, 2008, Dutkewych was admitted to the McLean
Hospital for substance abuse treatment. At the hospital, he
reported that he had been abusing Vicodin, and explained that he
had used a stolen credit card to buy things that he then sold to
pay for drugs. His intake form noted his recent diagnosis of Lyme
Disease and his ongoing depression.

He was discharged from the hospital on December 15, 2008,
and immediately entered McLean's residential treatment program. In
an Ambulatory Services Initial Assessment, Dutkewych reported a
"[l]ongstanding" history of obsessive compulsive disorder and
episodic depression. Although his OCD was "in reasonably good
control," his depressive symptoms were still significant and
included suicidal ideation. He admitted to persistent and daily
substance abuse over the last year. Dr. Joshua Katz, who evaluated
Dutkewych during this time, reported that "[m]any if not all of
[Dutkewych's] physical and cognitive symptoms can be explained by

-8-

chronic narcotic use and intermittent withdrawal symptoms." Dutkewych was discharged on January 21, 2009.

### 2.    Standard's Approval of Limited LTD Benefits

On April 16, 2009, Standard approved Dutkewych's claim for LTD benefits.  At that time, "a significant portion of the medical records in Mr. Dutkewych's claim file relate[d] to his psychiatric condition."  The physician consultant who reviewed his records noted that "Mr. Dutkewych has had a combination of chemical dependency and psychiatric disorder of life threatening proportions."  Standard concluded that his claim "supports that as of October 4, 2008, [Dutkewych] has been unable to perform with reasonable continuity the Material Duties of his Own Occupation due to symptoms and treatment related to substance abuse and major depression."

Standard specifically warned Dutkewych that his policy "limits payment of LTD benefits to 24 months during your entire lifetime for a Disability caused or contributed to by Mental Disorders, Substance Abuse or Other Limited Conditions."  "As major depression is considered to be a Mental Disorder, Standard will be applying the Mental Disorder limitation and thus limiting payment of LTD benefits to a maximum of 24 months."

### 3.    Dutkewych's Treatment for Chronic Lyme Disease

Between June 2009 and December 2009, Dutkewych entered a second residential substance abuse treatment program and

participated in two halfway house programs.  From around June 5 to June 22, 2009, Dutkewych was admitted to the McLean Adult Partial Hospital and Residential Program.  From June 22 to September 29, 2009, he resided at Phoenix House Springfield Center, a residential facility for substance abuse treatment in Springfield, Massachusetts.  From September 29 to December 21, 2009, he continued his treatment at the "North Cottage" Program, a residential facility for substance abuse treatment in Norton, Massachusetts.

During this time, Dutkewych began seeing Dr. Karen Isselbacher, Dr. Luz J. Ruiz, and Dr. Bernard Raxlen.  Each agreed with the diagnosis of Lyme disease.  Dr. Isselbacher, a primary care physician, conducted a spinal tap in July 2009, and found elevated levels of proteins which she interpreted as evidence of Lyme disease.  Dr. Raxlen, a psychiatrist, diagnosed Dutkewych with Lyme disease in December 2009 following a SPECT scan and a clinical evaluation.  Dr. Ruiz, a neurologist, sought an additional Western blot test in December 2010 which returned identical results to the test in November 2008 -- positive for Lyme disease under IGeneX criteria, but negative for Lyme disease under CDC/NYS criteria.

Under their care, Dutkewych has intermittently received intravenous ("IV") antibiotic treatment for Lyme disease.  After consulting with three physicians, respectively at Columbia, John's Hopkins, and Beth Israel, Dr. Isselbacher began to treat Dutkewych

with IV antibiotics in July 2009.  While on IV antibiotics from July 2009 to March 2010, Dutkewych reported improved symptoms.  He suffered a relapse after ending treatment, and restarted IV antibiotics in April 2010.  He stopped again in June 2010, when his port became infected, and restarted in February 2011, when a new port was installed.

During this time frame, Dutkewych also applied for and received a premium waiver on his life insurance policy from Standard and total disability benefits from the Social Security Administration ("SSA").  On April 28, 2009, Standard approved Dutkewych for a premium waiver on his life insurance policy based on a disability.  On June 10, 2010, the SSA approved Dutkewych for total disability benefits due to "Lyme Disease, fibromyalgia, muscle/joint pain, depression and substance abuse."  The SSA found that Dutkwewych's "Lyme Disease with associated joint pain and fatigue as well as his depression preclude him from performing work at any exertional level of the occupational base on a 'regular and continuing basis.'"

### 4.    Standard's Termination of LTD Benefits

On April 27, 2011, Standard informed Dutkewych that his benefits would be terminated as of June 1, 2011,[1] "due to the end of the 24-month Limitation Period."  Standard explained that,

------

[1]  The 24-month period was extended by 60 days under the terms of the Plan.

"[b]ecause the Group Policy limits payments for Disability caused or contributed to by a Mental Disorder, in order to continue to receive LTD Benefits, Mr. Dutkewych must be Disabled by a Physical Disease or Injury."  Specifically, "[t]he Physical Disease(s) or Injury(ies) must be so severe as to cause Disability in the absence of Substance Abuse, a Mental Disorder or Other Limited Condition."

Standard relied on a physician consultant, Dr. Leonard Sigal, described as "board-certified in internal medicine and rheumatology" and "a leading figure in both the treatment and research of chronic Lyme disease for many years,"[2] to review Dutkewych's "entire medical record."  Dr. Sigal concluded that Dutkewych's diagnosis of Lyme disease was "speculative."  He noted that Dutkewych's antecedent psychiatric disorder, substance abuse, and diagnosis of fibromyalgia had been "overshadowed by his treating physicians in favor of the premise that all of his complaints [were] attributable to 'chronic Lyme disease.'"

In so concluding, Dr. Sigal discounted the positive Western blot results at the IGeneX laboratory since, in his experience, the laboratory "routinely reports positive results that are not in agreement with clinical findings and . . . often reports positive results in patients with no likelihood of exposure."  He

---

[2]   Dutkewych argues that Dr. Sigal's "experience has been confined to the position that chronic Lyme disease does not exist and that individuals who are diagnosed with chronic Lyme disease more likely than not suffer from fibromyalgia or mental illness."

also disagreed with Dr. Isselbacher's reading of the spinal fluid analysis. "He noted that spinal fluid obtained on July 17, 2009 had normal glucose, a trivially elevated protein, and no inflammatory white or red blood cells counted." He concluded that it was "essentially normal." Dr. Sigal accordingly rejected the diagnosis of chronic Lyme disease by "a small group of physicians, considered local or regional Lyme disease experts . . . despite the lack of explicit clinical and laboratory evidence and the lack of response to month after month of multiple antibiotic therapies . . . ."

In the termination letter, Standard stated that it could not "conclude that a Physical Disease has been identified as defined by the policy." Furthermore, "[e]ven if [it was] to accept the diagnosis of Lyme disease, the consulting physician noted that the claimant may be able to work at this time if his psychiatric issues were appropriately dealt with." Importantly, Standard explained that it was "unable to conclude that Mr. Dutkewych remains Disabled as the result of a Physical Disease or Injury and since LTD Benefits payable for Disability caused or contributed to by Substance Abuse, a Mental Disorder or Other Limited Conditions are limited to 24 months, his claim will close with [Standard's] payment through June 1, 2011."

Standard explained that Dutkewych could request a review of Standard's decision within 180 days. With his request for

review, Dutkewych would have the right to submit additional information in support of his claim.

      5.     <u>Dutkewych's Request for Review</u>

On October 20, 2011, Dutkewych administratively appealed Standard's decision to limit his benefits to two years. He attached letters from his wife, his in-laws, two of his brothers, and two of his treating physicians.

Each of his family members explained Dutkewych's struggles with Lyme disease over the past few years. His mother-in-law stated that "Mark's limitations are both physical and intellectual." She wrote that "his depression  is clearly a reaction to his pain and fatigue rather than an endogenous depression." His brother attested that Dutkewych had "gone thr[ough] significant physical and mental changes over the past 2 years." As an example, his father-in-law related that "Mark cannot read a simple novel without getting confused and . . . need[ing] to re-read the pages that he just read five minutes earlier."

Dr. Sheila Statlender, a clinical psychologist who had been treating Dutkewych since March 2010, submitted a report dated March 28, 2011. Dr. Statlender stated that Dutkewych "has not abused substances" since they began treatment. Significantly, she diagnosed him with "Mood Disorder Due to Neuroborreliosis (central nervous system Lyme disease), with Depressive Features" and noted his "ongoing symptoms of anxiety and depression."

-14-

Similarly, Dr. Ruiz's letter, dated August 21, 2011, found Dutkewych to have mental disorders, and attributed them to his diagnosis of Lyme disease. Amongst Dutkewych's persistent symptoms, Dr. Ruiz listed cognitive limitations, depression, and anxiety. But, Dr. Ruiz wrote that "[d]epression and anxiety cannot explain Mr. Dutkewych's joint and muscle pain, headaches, neuropathy, lack of endurance and worsening fatigue upon exercise. These symptoms, and Mr. Dutkewych's clinical presentation, are consistent with Lyme disease."

Dutkewych sent Standard an additional report from a neuropsychologist, Dr. Leo Shea, following evaluations on May 21, 2011, and June 4, 2011. Dr. Shea concluded that Dutkewych's "significant decline" in cognitive capacities "cannot be explained by depression alone." He concluded that "the cause of Mr. Dutkewych's cognitive difficulties is primarily based in the resultant neurologic sequelae of Lyme disease with central nervous system involvement." Dr. Shea noted that Dutkewych's "cognitive reserve has also been impacted by his history of serial concussions, . . . obsessive compulsive diagnosis, and the medications prescribed to attenuate these diagnosed conditions."

In addition, Standard had received a letter from Dutkewych, dated April 27, 2011, that summarized his own medical condition. "Since first contracting Lyme Disease," Dutkewych wrote, "my symptoms have clustered in four primary areas: extreme

fatigue and lethargy, intense joint pain, cognitive issues and depression/anxiety. To date all of these issues persist." "Of all of the symptom areas," Dutkewych identified the cognitive issues as "often the most troubling." Although he used to handle complex public bond financing at the law firm, he wrote that he was now forgetful, easily overwhelmed, and struggled with reading comprehension. "Finally, despite working with my therapist weekly and taking anti-depressant medication, depression and anxiety continue to be an issue." Dutkewych noted that "[i]t is consistent with Lyme Disease to have mental health issues that are rooted in the illness."

### 6. Standard's Denial After Administrative Review

Based on Dutkewych's request, Standard's Administrative Review Unit reviewed Standard's decision to terminate Dutkewych's LTD benefits after 24 months. As part of this process, the Administrative Review Unit asked two independent physicians, who had not been involved in the earlier decision, to review Dutkewych's medical file. Specifically, the Administrative Review Unit asked Dr. Raymond Dattwyler,[3] an immunologist and rheumatologist, to comment on the laboratory findings in Dutkewych's medical file, the CDC criteria, and the assessment of

---

[3] Dutkewych notes that, "[l]ike Dr. Sigal, Dr. Dattwyler has a long history with Lyme disease, as a member of the [Infection Disease Society of America] and an outspoken voice against the existence of chronic Lyme."

Dutkewych's condition.  The Administrative Review Unit also asked
Dr. Bob Gant, a clinical neuropsychologist, to review the
information related to Dutkewych's claimed cognitive deficits, and
the findings of Dr. Shea.

In a report dated March 12, 2012, Dr. Dattwyler concluded
that "Dutkewych simply did not have the clinical manifestations
that I would expect to see in a patient with Lyme disease."
Critically to Dr. Dattwyler, "Dutkewych's Lyme serologies are
negative and none meet the CDC criteria."  Dr. Dattwyler
specifically rejected "any test results from a lab that does not
adhere to CDC guidelines," such as the IGeneX tests.  "Simply
stated his negative serologies and his clinical picture strongly
support the finding that Mr. Dutkewych does not have Lyme disease
now and never did."

In a report dated April 5, 2012, Dr. Gant stated that he
was "unable to establish a psychological or neuropsychological
diagnosis with the available information."  "In my opinion," Dr.
Gant wrote in an addendum report issued on April 20, "Dr. Shea
administered an insufficiently brief examination to support his
conclusions regarding a diagnosis of Chronic Lyme Disease, work-
related limitations related to this disease, and his ultimate
conclusions regarding impaired work functioning."  Dr. Gant

-17-

recommended a comprehensive and forensically sophisticated neuropsychological examination to verify a definitive diagnosis.[4]

Both consulting physicians questioned the existence of chronic Lyme disease as a diagnosis in general. In his report, Dr. Dattwyler cautioned that "there is no acceptable definition of 'chronic Lyme disease,'" and that "[i]t is not accepted as a diagnosis by mainstream medicine." Instead, "[t]he term 'chronic Lyme disease' is being applied to patients with vague complaints most of who[m] have never had Lyme disease." Dr. Gant "concur[red]" with Dr. Dattwyler's statement that chronic Lyme disease is not accepted by mainstream medicine. "In fact," Dr. Gant wrote in his report, "available medical information indicates that there is not medical consensus that Lyme disease is a credible diagnosis to offer an individual with this claimant's clinical history."

On May 4, 2012, the Administrative Review Unit issued a letter to Dutkewych's counsel to inform her that it had completed

---

[4]  In the review letter, the Administrative Review Unit noted that it had contacted Dutkewych's counsel and "offered to arrange for a neuropyschological examination at The Standard's expense" after receiving Dr. Gant's assessment. The Administrative Review Unit and Dutkewych's counsel had discussed that the results would not likely change the prior determination "because The Standard did not find that a diagnosis of Lyme disease was supported in Mr. Dutkewych's case and because all of the other possible causes of impairment that were suggested by Dr. Gant related to psychiatric disorders or the treatment [Dutkewych] received for his psychiatric disorders." "Given the above," Dutkewych's counsel declined to pursue the evaluation.

its independent review.  The Administrative Review Unit found that "the correct decision was to close [Dutkewych's] claim as [of] June 1, 2011 under the Disabilities Subject to Limited Pay Periods Provision" of his Plan.

In the review letter, the Administrative Review Unit reiterated that "the Disabilities Subject to Limited Pay Periods provision of the [Plan] limits payment of LTD Benefits to 24 months during your entire life time for a Disability caused or contributed to by any one or more of the following . . . : 1) Mental Disorders, 2) Substance Abuse, or 3) Other Limited Conditions."  The Administrative Review Unit then summarized, in detail, Dutkewych's medical history, the evidence that he had submitted in support of his claim that he was disabled as a result of Lyme disease, and the reports of Standard's consulting physicians.  In addition, the Administrative Review Unit noted the controversy within the medical community "regarding the diagnosis and treatment of Lyme disease." The Administrative Review Unit concluded that "it is entirely reasonable and, in fact, prudent that The Standard evaluate disability claims in the context of mainstream medical opinion."

Relying on the assessments of Drs. Dattwyler and Gant, and the consistent assessments of Drs. Sigal and Goldenberg, the Administrative Review Unit concluded that Dutkewych was not disabled "as a result [of] Lyme disease."  "Rather," it stated, "the available medical evidence supports that [Dutkewych]'s mental

-19-

health conditions in combination with his chronic pain condition (fibromyalgia) and substance abuse are the most likely cause of his reported symptoms."  The Administrative Review Unit agreed with Standard's earlier decision to limit Dutkewych's benefits to 24 months under the Limited Conditions Provision as a result.  The Administrative Review Unit explained:

> Because we do not find evidence to support that Mr. Dutkewych was impaired from performing his Own Occupation as of June 1, 2011 by a physical disease or injury (which was independent from his mental disorders, substance abuse and fibromyalgia with possible chronic fatigue), we have determined that Mr. Dutkewych does not qualify for additional LTD benefits from The Standard, and that his claim must remain closed.

C.      Present Litigation

        Following Standard's decision to terminate LTD benefits after 24 months, Dutkewych sought review in the District of Massachusetts.  In his First Amended Complaint, filed on September 27, 2012, he asserted that, "[a]t the end of the two year limited pay period for disabilities caused or contributed to by a Mental Disorder, Mr. Dutkewych was disabled due to the symptoms of Lyme disease, a Physical Disease under the terms of the Plan."  Dutkewych sought enforcement of the terms of the Plan for unpaid benefits, and attorneys' fees and costs.  Both parties moved for summary judgment.

        The district court held that Standard did not abuse its discretion when it concluded that Dutkewych was not disabled by

-20-

Lyme disease, and terminated his benefits after 24 months. Dutkewych, 2014 WL 1334169, at *10-12. "[W]hile there is evidence in the record supporting a diagnosis of Lyme disease or chronic Lyme disease," the court stated, "there is still substantial evidence in the record supporting otherwise, upon which Standard relied in making its determination that Dutkewych was not disabled by Lyme disease." Id. at *9. In reaching its conclusion, the court noted the qualified consulting physicians' opinions as to Dutkewych's diagnosis with chronic Lyme disease, id. at *10-11, as well as the "substantial evidence . . . that Dutkewych suffered from non-physical impairments, such as depression," id. at *12. As a result, the district court granted Standard's motion for summary judgment and denied Dutkewych's motion for summary judgment. Id. at *14. This appeal followed.

## II. Analysis

We review the district court's grant of summary judgment de novo. Cusson v. Liberty Life Assurance Co. of Bos., 592 F.3d 215, 223 (1st Cir. 2010). Although Dutkewych assigns various errors to the district court's decision, "we need not attend separately to each of these arguments." Fire & Police Pension Ass'n of Colo. v. Simon, 2015 WL 500748, at *10 (1st Cir. Feb. 6, 2015). It is sufficient to affirm if we reach the same conclusion on any basis. See id.

-21-

Like the district court, our review of Standard's decision is deferential.[5] See Dutkewych, 2014 WL 1334169, at *1 n.1. "Where, as here, the administrator of an ERISA plan is imbued with discretion in the interpretation and application of plan provisions, its use of that discretion must be accorded deference." Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan, 705 F.3d 58, 61 (1st Cir. 2013). A reviewing court must uphold Standard's decision unless it is "arbitrary, capricious, or an abuse of discretion."[6]  Ortega-Candelaria v. Johnson & Johnson, 755 F.3d 13, 20 (1st Cir. 2014) (internal quotation marks and citation omitted).  Under this standard of review, "the plan administrator's determinations must be 'reasoned and supported by substantial evidence.'  In short, they must be reasonable."  Colby, 705 F.3d at 62 (citation omitted).

---

[5]  The conflict of interest in Standard's position as both the claim administrator and the payer of benefits "does not alter the standard of review, but rather is 'but one factor among many that a reviewing judge must take into account.'"  Ortega-Candelaria v. Johnson & Johnson, 755 F.3d 13, 27 (1st Cir. 2014) (quoting Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 116 (2008)).

[6]  We have previously noted that "'[f]or purposes of reviewing benefit determinations by an ERISA plan administrator, the arbitrary and capricious standard is functionally equivalent to the abuse of discretion standard.'"  D & H Therapy Assocs., LLC v. Bos. Mut. Life Ins. Co., 640 F.3d 27, 34 n.5 (1st Cir. 2011) (quoting Wright v. R.R. Donnelley & Sons Grp. Benefits Plan, 402 F.3d 67, 74 n.3 (1st Cir. 2005)).

Dutkewych argues that "the contemporaneous medical record demonstrates convincingly that [he] was disabled as a result of chronic Lyme disease in June 2011 and is entitled to benefits from that date, forward." Under the terms of the Plan, however, whether or not that argument is correct, "[p]ayment of LTD Benefits is limited to 24 months during your entire lifetime for a Disability caused or contributed to by . . . Mental Disorders." We need not and do not decide whether chronic Lyme disease is a valid diagnosis in general, or as applied to Dutkewych specifically. Even if Dutkewych was disabled as a result of chronic Lyme disease in June 2011, Standard's decision to limit his benefits to 24 months based on the Mental Disorder Limitation was not arbitrary or capricious.

Dutkewych raises three objections to the application of the Mental Disorder Limitation in his case. First, Dutkewych argues that the record lacks substantial evidence that a mental disorder caused or contributed to his disability in June 2011, when his benefits were terminated. Next, Dutkewych argues that Standard's application of the Mental Disorder Limitation contradicts the "Rules for Disabilities Subject to Limited Pay Periods" set forth in the Plan. Finally, Dutkewych argues that Standard's reliance on the Mental Disorder Limitation arose only in litigation and should be disregarded as a post-hoc rationalization. We address and reject each argument in turn.

A.          Substantial Evidence for Limitation

          The Mental Disorder Limitation applies if "Mental

Disorders" "cause[] or contribute[] to" the claimant's disability.

"Mental Disorder," in turn, is defined as:

> [A]ny mental, emotional, behavioral,
> psychological, personality, cognitive, mood or
> stress-related abnormality, disorder,
> disturbance, dysfunction or syndrome,
> regardless of cause . . . or the presence of
> physical symptoms.

In this case, there is substantial evidence that Dutkewych's mental

illness, whether or not related to chronic Lyme disease,

contributed to his disability as of June 2011.[7]  The contrary

argument is flatly contradicted by his own admissions and the

numerous medical opinions from both his own and other doctors.

          Reports from Dutkewych's own treating physicians

establish that he had ongoing mental disabilities, in addition to

his physical symptoms, as of the period around June 2011.  In a

report dated March 28, 2011, Dr. Statlender stated that Dutkewych

"continues to experience a range of both physical and emotional

---

          [7]  The parties dispute whether it is Standard's burden to
prove that Dutkewych was subject to the limited pay period, or
Dutkewych's burden to prove that he was not.  Under traditional
insurance law principles, "once an insured has met [his] initial
burden of proving that a claim falls within the grant of coverage,
the burden shifts to the insurer to show that an exclusion defeats
coverage."  Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 83 (1st Cir.
2010).  We noted the difficulty of characterizing a similar mental
illness provision as an exclusion or as a limitation on the
continuation of benefits in Gent.  Id.  Here, as in Gent, we need
not decide how to allocate the burden of proof since Standard would
prevail regardless.  See id.

symptoms," including "ongoing symptoms of anxiety and depression," and diagnosed him with "Mood Disorder Due to Neuroborreliosis (central nervous system Lyme disease), with Depressive Features." Likewise, in a report dated August 21, 2011, Dr. Ruiz listed cognitive limitations, depression, and anxiety amongst "Dutkewych's persistent symptoms." Finally, in Dutkewych's 2011 neuropsychological evaluation, Dr. Shea wrote that Dutkewych's "presenting symptoms" included cognitive limitations, "anxiety and depression that impacts his mood," and "severe fatigue." Testing revealed that "Dutkewych suffers from significant cognitive deficits, which are consistent with neurological Lyme disease that has gone untreated for a prolonged period of time, and which significantly impacts his professional career and has restricted his ability to continue working at his designated position."

In addition, Dutkewych's own letter to Standard on April 27, 2011, highlighted the mental disorders with which he struggled. He stated that his symptoms fell into "four primary areas: extreme fatigue and lethargy, intense joint pain, cognitive issues and depression/anxiety." "To date all of these issues persist." "Of all of the symptom areas," Dutkewych wrote, "the cognitive issues are often the most troubling to me." Like his physicians, Dutkewych ascribed his physical symptoms, cognitive issues, and mental health issues to Lyme disease.

Dutkewych maintains that these "symptoms" of chronic Lyme disease cannot form the basis for the Mental Disorder Limitation. He argues that "[e]xperiencing depression derivative of a physical condition and being disabled by a psychiatric disorder are two very different animals." He stresses that his treating physicians did not attribute his disability to his psychiatric conditions in June 2011.

The Mental Disorder Limitation, however, is broadly written. The Limitation applies if a mental disorder, regardless of its own cause, "caused or contributed" to a claimant's disability. It is clear from Dutkewych's own evidence that mental disorders, regardless of cause, continue to contribute to his disability. This is sufficient to trigger the Mental Disorder Limitation based on the facts of this case and the wording of this Plan.

In Schwob v. Standard Insurance Co., 248 F. App'x 22 (10th Cir. 2007), the Tenth Circuit reached the same conclusion when faced with an almost identical limitation. "At best," the claimant's evidence indicated that "a mental disorder, such as depression, could be secondary to Lyme disease, which she may or may not have." Id. at 28. The Tenth Circuit concluded that, even so, Standard was reasonable in applying the Mental Disorder Limitation. Id. at 29. The court explained:

> [E]ven if we accept the premise that [the claimant]'s mental disorder is secondary to a

-26-

> physical illness, this would not prevent
> Standard from applying the mental-disorder
> limitation to her claim. The Plan's
> definition of mental disorder includes mental
> disorders 'regardless of cause.' As long as
> [the claimant]'s mental disorder contributed
> to her disability, the limitation would apply
> even if the mental disorder resulted from Lyme
> disease or another physical disease.

Id. The same logic applies to the case at hand.

B.      Rules for Applying Limitation

Dutkewych attempts to limit the application of the Mental Disorder Limitation by pointing to the "unique, explicit rules for the application of the Mental Disorders, Substance Abuse and Other Limited Conditions provision." The Limited Conditions Provision limits payment of LTD benefits to "24 months during your entire lifetime for a Disability caused or contributed to by . . . : (1) Mental Disorders; (2) Substance Abuse; or (3) Other Limited Conditions." The "Rules" for the application of the Limited Conditions Provision state:

> 1. If you are Disabled as a result of a
> Mental Disorder or any Physical Disease or
> Injury for which payment of LTD Benefits is
> subject to a limited pay period, and at the
> same time are Disabled as a result of a
> Physical Disease, Injury, or Pregnancy that is
> not subject to such limitation, LTD Benefits
> will be payable first for conditions that are
> subject to the limitation.
>
> 2. No LTD Benefits will be payable after the
> end of the limited pay period, unless on that
> date you continue to be Disabled as a result
> of a Physical Disease, Injury, or Pregnancy
> for which payment of LTD Benefits is not
> limited.

-27-

Dutkewych argues that the Rules envision payment of benefits after two years even if physical non-limited conditions exist contemporaneously with limited conditions. Under Dutkewych's reading of Rule One, benefits must be paid first for a limited condition, "even if a physical disability coexists." Rule Two then requires the insurer to continue paying benefits after the limited pay period if the physical disability continues at that point. He argues that "[t]his is irrespective of the fact that the physically disabling condition may have caused (or continue to cause) disabling mental illness, as defined under the Plan, as benefits have already been paid out for the mental illness aspect of the disability." In essence, Dutkewych argues that the Mental Disability Limitation ceases to apply after the first two years of benefits by operation of the Rules.

Standard maintains that the Mental Disability Limitation continues to apply after two years if a physical non-limited condition co-exists with a limited condition. In other words, if a claimant is disabled as a result of mental illness and physical disease, Rule One requires benefits to be paid for conditions that are subject to the limitation first. Rule Two allows benefits to continue only if the claimant continues to be disabled by a physical disease at the end of the limited pay period. However, the general limitation still applies at the conclusion of the 24-month period. The interaction of the general limitation and Rule

-28-

Two means that a claimant can receive benefits after the limited pay period only if he continues to be disabled due to a physical disease separate from any limited condition.

We emphasize again our deferential review in this case. The Plan allows Standard "to interpret the Group Policy and resolve all questions arising in the . . . interpretation . . . of the Group Policy." Accordingly, "the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'"[8] Conkright v. Frommert, 559 U.S. 506, 521 (2010) (citation omitted). Standard's interpretation of the Mental Disability Limitation and the Rules governing its application is "by no means unreasonable and so must prevail." See Wallace v. Johnson & Johnson, 585 F.3d 11, 15 (1st Cir. 2009).

Other words of the general limitation support the reasonableness of Standard's interpretation. The Plan states that "[p]ayment of LTD Benefits is limited to 24 months during your entire lifetime for a Disability caused or contributed to by . . . Mental Disorders." (Emphasis added.) Dutkewych's argument that the Mental Disability Limitation ceases to operate after those 24 months is unpersuasive, particularly when the Rules say no such thing. Rule Two states that benefits will not be paid after the

---

[8]   Neither the Supreme Court nor this court has "spoken directly to how courts should assess whether an administrator's construction of a plan term is so unreasonable as to constitute an abuse of discretion." D & H Therapy Assocs., 640 F.3d at 36. We need offer no further elucidation in this case.

limited pay period unless the claimant has a non-limited physical disease, injury, or pregnancy at that time. This does not compel the opposite conclusion that benefits <u>will</u> be paid after the limited pay period even if the claimant continues to suffer from a limited mental disability.

Standard's reading of the Rules is further supported by its consistency with another provision in the Plan. Elsewhere, the Plan states:

> If a period of Disability is extended by a new cause while LTD Benefits are payable, LTD Benefits will continue while you remain Disabled. However . . . [t]he Disabilities Excluded From Coverage, Disabilities Subject To Limited Pay Periods, and Limitations sections will apply to the new cause of Disability.

In effect, Dutkewych is asking to extend his period of payments for disability beyond 24 months due to a physical disease instead of limited conditions. The Plan explicitly specifies that the Limited Conditions Provision, and the subsumed Mental Disability Limitation, will continue to apply.

C.      <u>Post-Hoc Rationalization</u>

As a final salvo, Dutkewych mistakenly argues that Standard's broad interpretation of the Mental Disability Limitation "was never raised during the internal appeals process and stands in direct contradiction to Standard's interpretation of the provision at that time." Dutkewych urges us to "reject [Standard's] analysis as a post-hoc rationalization undeserving of deference" under our

logic in <u>Glista</u> v. <u>Unum Life Insurance Co. of America</u>, 378 F.3d 113 (1st Cir. 2004).

In <u>Glista</u>, we held an insurer to its explanation for denying benefits articulated during its internal claims review process. 378 F.3d at 132. There, the insurer had raised two bases for its denial of relief <u>in litigation</u> -- the Treatment Clause and the Symptoms Clause. <u>Id.</u> at 126. Our review of the record revealed that the insurer had never relied on the Symptoms Clause during its internal review process, and that "a reasonable participant would have understood the denial to rest on the Treatment Clause alone." <u>Id.</u> at 129. We held that reviewing courts have "a range of options available" in such circumstances. <u>Id.</u> at 116. In that case, we barred the insurer's argument on the Symptoms Clause as a post-hoc rationalization. <u>Id.</u> at 128, 131.

According to Dutkewych, the same result is warranted here. Dutkewych contends that, "[p]rior to litigation, Standard's sole defense was that chronic Lyme does not exist as a disease." Moreover, "[t]he only inquiry during the internal appeals process was the cause of Mr. Dutkewych's disabling symptoms, and not whether a limited condition caused or contributed to his disability; in fact, this analysis was never once cited by Standard during its review." This claim is contradicted by the administrative record.

-31-

Standard has repeatedly stressed that Dutkewych's Plan "limits payment of LTD Benefits to 24 months during [the claimant]'s entire lifetime for a Disability caused or contributed to by Mental Disorders, Substance Abuse or Other Limited Conditions." In both its April 26, 2011, termination letter, and its May 4, 2012, review letter, Standard explicitly premised its decision on the Limited Conditions Provision.

In its original termination letter to Dutkewych, Standard clearly explained the operation of the Limited Conditions Provision and its reliance on the same. Standard wrote in the opening paragraph:

> Because the [Plan] limits payments for Disability caused or contributed to by a Mental Disorder, in order to continue to receive LTD Benefits, Mr. [Dutkewych] must be Disabled by a Physical Disease or Injury. The Physical Disease(s) or Injury(ies) must be so severe as to cause Disability <u>in the absence</u> of Substance Abuse, a Mental Disorder or Other Limited Condition.

(Emphasis added). In its analysis, Standard rejected Dutkeywch's diagnosis of Lyme disease, but identified mental disorders as an alternative basis for rejection of his disability claim in any case:

> Based on the information in the claim file, we cannot conclude that a Physical Disease has been identified as defined by the policy.
>
> Even if we were to accept the diagnosis of Lyme disease, the consulting physician noted that the claimant may be able to work at this

time if his psychiatric issues were
appropriately dealt with.

Because Standard concluded that Dutkewych was not disabled as a
result of a physical disease, and because LTD Benefits are limited
for a "Disability caused or contributed to by" limited conditions,
Standard closed his claim on June 1, 2011.

In its subsequent review letter, Standard again rejected
Dutkewych's claim that he was disabled as a result of Lyme disease
and stressed the evidence of limited conditions in the record.
Standard wrote:

> Based on a comprehensive review of all of the
> information in Mr. Dutkewych's claim file, we
> find that the available evidence does not
> support that Mr. Dutkewych has been precluded
> from performing his Own Occupation as a result
> [of] Lyme disease. Rather the available
> medical evidence supports that your client's
> mental health conditions in combination with
> his chronic pain condition (fibromyalgia) and
> substance abuse are the most likely cause of
> his reported symptoms.

That Standard's language suggested that limited conditions caused,
rather than merely contributed to, Dutkewych's disability is of no
moment since its reliance on the Limited Conditions Provision is
unassailable. In the very next sentence, Standard reiterated the
application of the Limited Conditions Provision to Dutkewych's
case:

> Because we do not find evidence to support
> that Mr. Dutkewych was impaired from
> performing his Own Occupation as of June 1,
> 2011 by a physical disease or injury (which
> was independent from his mental disorders,

-33-

> substance abuse and fibromyalgia with possible
> chronic fatigue), we have determined that Mr.
> Dutkewych does not qualify for additional LTD
> benefits from The Standard, and that his claim
> must remain closed.

(Emphasis added).

Standard's reliance on and interpretation of the Limited
Conditions Provision took place before there was any litigation and
Dutkewych had adequate notice during the administrative process.
Indeed, when Standard offered to pursue additional
neuropsychological testing during the administrative review
process, Dutkewych's counsel refused specifically because the
results of such testing would support the already-imposed Limited
Conditions Provision, "and, thus, would not change the prior
determination on Mr. Dutkewych's claim."  This case is a far cry
from Glista, in which the insurer articulated an entirely new basis
for the denial of benefits for the first time in litigation.  See
378 F.3d at 129.

### III.  Conclusion

We conclude that Standard's limitation of Dutkewych's
benefits to 24 months was not arbitrary or capricious given the
substantial evidence in the record that mental disorders,
regardless of their cause, contributed to his disability as of June
1, 2011.  We affirm the grant of summary judgment in favor of
Standard.

So ordered.